[Crim. No. 966. Second Appellate District, Division Two.—July 3, 1923.]

THE PEOPLE, Respondent, v. PAUL GRAHAM, Appellant.

[1] CRIMINAL LAW — MURDER — SELF-DEFENSE — EVIDENCE. — In this prosecution, in which the defendant was convicted of murder in the second degree, while there were discrepancies in the testimony of the several eye-witnesses to the fatal scene, the evidence was such as to justify the jury in concluding that the defendant was the aggressor in the affray between him and the deceased and that the taking of life under the circumstances was not necessary to the self-defense of the defendant.

[2] ID.—THREATS BY DECEASED—ASSAULTS—SELF-DEFENSE—EVIDENCE. In this prosecution for murder, in view of the instructions on the subject of self-defense given by the court, it was not prejudicial error to refuse to give the further instruction requested by defendant to the effect that if the jury found that the deceased had made threats against defendant and those threats were communicated to defendant, thereby placing him under constant fear of bodily harm, as a result of which he considered his life in danger when he met the deceased, and if the jury further found that the defendant was in lawful pursuit of business or pleasure at the time and place of the fatal affray, and while in such pursuit he was accosted by the deceased, who was armed with a deadly weapon, and driven from his ground, then under the law defendant had a right to immediately arm himself for the purpose of self-protection against any fresh assaults with a deadly weapon from the deceased.

---

1. General doctrine of self-defense set up by accused, who began the conflict, notes, 109 Am. St. Rep. 804; 45 L. R. A. 687.

[3] Id. — Justification for Assault — Words of Insult — Instruc-
tions.—The court having instructed the jury that "Mere words
of insult or of reproach, however grievous, will not justify an
assault, a blow or a threatening demonstration with a deadly
weapon," it was not error to refuse defendant's requested in-
struction to the effect that "no mere words of accusation and
insult, however profane or severe, justify an assault under the
law" and that, therefore, the deceased was not justified by any
words spoken by defendant to him or regarding him in assaulting
defendant.

[4] Id.—Repetition of Instructions.—When the substance of the
refused instruction is given, the defendant is not entitled to a
repetition of the same matter or to the adoption by the court of
his own phraseology.

APPEAL from a judgment of the Superior Court of Tu-
lare County. J. A. Allen, Judge. Affirmed.

The facts are stated in the opinion of the court.

D. E. Perkins, Karl A. Machetanz and Patterson Howell
for Appellant.

U. S. Webb, Attorney-General, and Erwin W. Widney,
Deputy Attorney-General, for Respondent.

SHENK, J., *pro tem.*—Appellant was convicted of murder
in the second degree and appeals from the judgment and
from the order denying his motion for a new trial.

The deceased, E. W. Mort, died from a gunshot wound
inflicted by the defendant on the twenty-first day of August,
1922. There is no dispute as to this fact, but it is contended
that the killing was necessary to the self-defense of the de-
fendant under the circumstances shown in evidence.

The deceased lived near the town of Earlimart, in Tulare
County. Ill feeling had existed between him and the de-
fendant for some time. In August, 1921, the deceased had
occasion to approach a hay-baling outfit operating about two
miles from Alpaugh for the purpose of inquiring if the hay
then in process of baling was for sale. The defendant was
working on the baler and when he noticed the presence of
the deceased he berated him for having accused him at some
prior time of stealing hogs. A physical encounter ensued
in which the deceased was thrown to the ground and severely

beaten by the defendant. Defendant was undoubtedly a more powerful man than the deceased and as an indication of his disposition it was in evidence that when he had thrown the deceased to the ground he struck and kicked him and when told by a fellow-workman that "he had whipped him enough" and to let him up the defendant replied: "You fellows go back out of this, this is my fight." The existing enmity affords a background in viewing the actions of the parties a year later.

Defendant was in the town of Earlimart on the afternoon of the day of the killing and was heard to say that he was waiting for a man to come to town in a few minutes; that he was looking for him, did not want to miss him, and that then "he guessed he would get him."

About sixteen witnesses who observed the affray testified at the trial. One witness for the prosecution testified that about a quarter of 6 he saw the deceased drive up in his automobile and stop in front of Vaughan's store, which was a combination general store and postoffice; that the deceased alighted from his car, walked around the front end of the car to the sidewalk and started for the store door, where he met the defendant face to face; that defendant then said to the deceased: "Come down in the street and we'll settle this"; that Mort said: "All right," turned around and reached into his car for a club or billy; that when the defendant saw that the deceased had a weapon in his hand he ran down the street and turned the corner; that Mort followed him for a short distance, then turned back to a place near the front of the store, and put the club in his hip pocket; that he saw the defendant approach his own car yelling and making motions with his hands; that he saw him take a 30–30 rifle from his car and go toward the Vaughan store; that the deceased had entered the store and was about two-thirds of the way back talking to the clerk; that the defendant proceeded to a position in front of the store, where he called the deceased many opprobrious names and told him to come outside and he would fix him; that deceased remained in the store until the defendant repeated his command and then went outside; that a bystander importuned the defendant to desist, saying: "Put that gun up, you are too good a man to do anything like this," whereat the defendant said to the bystander: "You get out of the

way or I will poke you, too," and cursed him; that defendant then addressed Mort, saying: "You —— —— liar, you know I never stole those hogs"; that Mort replied: "You know you stole those hogs"; that the defendant then said: "If you say I stole those hogs you are a —— —— —— liar," and repeated the epithet with variations, at the same time pointing the rifle directly at the deceased with less than a foot intervening between the muzzle of the rifle and Mort's body; that Mort seized the muzzle of the gun with his left hand, shoved it to one side, reached into his right hip pocket for his billy and struck the defendant three or four blows; that the defendant received most of the blows on his left arm, which was upraised for protection, but received one blow on the head; that the defendant then jerked the gun away from the deceased's grasp, staggered back a few steps to catch his balance and fired; that the deceased whirled around, fell to the ground and said: "He got me, boys, he got me," to which the defendant replied: "You are —— —— right, I got you," turned around and walked away.

The bullet pierced the chest of the deceased, shattering the fifth rib and carrying a portion of the rib into the lung cavity. He died about an hour later.

It was in evidence that defendant put the rifle in his car, went to a near-by gas-filling station, and engaged in conversation with a man to whom he said: "I just shot him down there." When asked why he had done so he replied: "He hit me over the head with a club. I have got self-defense."

Another witness testified that he saw the defendant take the rifle from his car; that he was about ten feet from the defendant when he saw this and that as the defendant reached into his car for the gun he said: "I'll get him"; that shortly thereafter he heard the shot.

A clerk in Vaughan's store testified that it was the custom of the deceased to stop at the store in the evening to get his mail and the groceries he had ordered in the morning and that he came to the store for that purpose about a quarter of 6 on the evening of the tragedy.

Another witness testified that when the defendant took the gun from his car he saw him make motions as if he were loading it; that the defendant walked toward the front of Vaughan's store and called out: "Come out now, you —— —— ——; I will fight you"; that the defendant pointed

the rifle directly toward Mort's stomach; that Mort grabbed
the rifle barrel, pushed it aside and began beating the de-
fendant with a billy; that the defendant jerked the gun loose
from Mort's grasp and fell backward on his buttock; that
when Mort lost his grasp on the gun he appeared to be
frightened, ran backward toward him (the witness) and
seemed to be looking for something to get behind for pro-
tection; that the deceased was between ten and fifteen feet
from the end of the rifle when it was fired.

There were slight discrepancies in the testimony of the
several witnesses, but it may be said that they were no more
pronounced than is usual in the description of the same ex-
citing scene by different eye-witnesses. There was, however,
a direct conflict in the evidence as to whether the defend-
ant or the deceased spoke first after the deceased came out
of Vaughan's store. Some witnesses stated that the defend-
ant spoke first, calling the deceased vulgar names, others
testified that the deceased spoke first, accusing the defendant
of stealing hogs. Whatever discrepancies or conflicts ex-
isted were for the determination of the jury in passing upon
the weight of the evidence and the credibility of the wit-
nesses. (*People* v. *Musumeci*, 51 Cal. App. 454 [197 Pac.
129].)

[1] From the evidence adduced the jury was justified in
finding that on the day of the homicide the defendant ar-
rived in the town before the deceased and with malice and
revenge in his heart was waiting for him to appear; that so
far as the deceased was concerned the meeting of the two
in Earlimart on that day was a chance meeting; that after
the first quarrel the deceased abandoned further controversy
and went into the store attending to his own business; that
thereafter the defendant obtained his rifle with the intent
to employ deadly means if the occasion were presented; that
the deceased engaged in further controversy only after a
challenge to fight had been twice repeated by the defendant
in a belligerent and boisterous manner; that before the shot
was fired the deceased, being without firearms, realized his
unequal and perilous situation and endeavored to seek pro-
tection by retreat and that at the fatal moment the de-
ceased was in no position to inflict upon the defendant death
or great bodily harm. From these facts it was proper to
conclude that the defendant was the aggressor and that the

taking of life under the circumstances was not necessary to the self-defense of the defendant. No other conclusions are reasonably deducible from the evidence.

It is contended that "the right of the defendant to walk the streets had been violated" and that "acting under the sting of his humiliation his first thought was probably to vindicate that right and to arm himself for that purpose." The case of *People* v. *Batchelder*, 27 Cal. 70 [85 Am. Dec. 231], is strongly relied upon as a precedent in justification of defendant's conduct. In that case it appeared that the Farallone Egg Company was engaged in gathering and marketing the eggs deposited by wild birds on one of the Farallone Islands in the Pacific Ocean. The defendant endeavored to land on the island ostensibly for the same purpose. He was met with armed resistance on the part of guards stationed by the company at the landing; he departed but returned shortly thereafter with companions fully armed and sought a landing; he was first fired upon by the company's guards and in the return fire by the defendant or by one of his companions the deceased was killed, and the homicide was held to be justifiable. It appeared that the island was a part of the public domain. It was declared that the defendant had the right, in common with the deceased and all others, to go upon the island to accomplish his lawful purpose, just as one would have the right to roam the mountains in the public domain for the purpose of hunting and fishing, and to do so unmolested and unhindered by others having an equal but no greater right. The equal right of all to go upon public property was involved in that case and it was held in effect that when the defendant had been fired upon he could, under the circumstances shown, meet that force with like force in order to protect his life.

In this case there was no showing to justify the conclusion that the deceased was interfering in any way with the use by the defendant of the public highway. The fact that the controversy took place on a public street was merely a coincidence. The situation of the parties would have been the same if the affair had taken place on the gas-station grounds or on other private property.

The case of *People* v. *Hecker*, 109 Cal. 457 [30 L. R. A. 403, 42 Pac. 307], is also relied upon as embodying the rules

in justification of defendant's course of action. That case contains a general discussion of the law of self-defense, both as to what the defendant may do to warrant the taking of life and as to what he may not do in a contest with an adversary. It is declared that the acts which a defendant may do and justify under the plea of self-defense depends primarily upon his own conduct and secondarily upon the conduct of the deceased. The first rule laid down in that case may well apply to the facts presented to the jury in this case. That rule was embodied in one of the instructions of the court in this case and is stated as follows: "Self-defense is not available as a plea to a defendant who has sought a quarrel with a design to force a deadly issue and thus through his own fraud, contrivance or fault to create a real or apparent necessity for killing."

The right of pursuit after the first quarrel, as contended for by the defendant, was not available to him under the facts shown. That right is subject to the limitation also stated in the Hecker case in the following language: "But the pursuit must not be in revenge, nor after the necessity for the defense has ceased, but must be prosecuted in good faith to the sole end of winning his safety and securing his life."

[2] The following instruction was offered by the defendant and refused by the court: "You are instructed that if from the testimony you find that E. W. Mort had made threats against the defendant, and these threats were communicated to the defendant, thereby placing him under constant fear of bodily harm, as a result of these threats he considered his life in danger when he met the said Mort and if you further find from the evidence that the defendant was in lawful pursuit of business or pleasure in the town of Earlimart on the twenty-first day of August, 1922, and while in such pursuit he was accosted by said Mort who was armed with a deadly weapon, and driven from his ground, then under the law the defendant had a right to immediately arm himself for the purpose of self-protection against any fresh assaults with a deadly weapon from said E. W. Mort." The refusal to give this instruction is assigned as error. Counsel states that this instruction goes to "the very heart of the defendant's case." The term "fresh assaults" employed in the instruction would include a provoked as well

as an unprovoked fresh assault. The question of provocation was involved in this case, and without some qualification the instruction fell short of stating the full right and duty of the defendant under the circumstances. This qualification was incorporated in an instruction also requested by the defendant and given as follows: "The defendant claims that he shot in his own self-defense and to repel an unprovoked assault which the deceased was making upon him. The right of self-defense, that is, the right of one attacked or assaulted by another, to repel such an assault and fully protect himself, is founded on the laws of nature. This right is expressly recognized by the laws of our own state." The court further instructed the jury as follows: "One who has received information of threats against his life or person made by another is justified in acting more quickly and taking harsher measures for his own protection in the event of assault either actual or threatened, than would be a person who had not received such threats; and if in this case you believe from the evidence that the deceased made threats against the defendant and that the defendant because of such threats made previously to the transaction complained of, and communicated to the defendant, had reasonable cause to fear greater peril in the event of an altercation with the deceased than he would have otherwise, you are to take such facts and circumstances into your consideration in determining whether the defendant acted in a manner in which a reasonable man would act in protecting his own life or bodily safety." The instructions thus given sufficiently covered the subject.

It is next contended that the court erred in refusing six different instructions tendered by the defendant, also relating to the law of self-defense, and two instructions on the question of reasonable doubt. No argument or citation of authority is presented in support of these contentions and no further notice need be taken of them. (*Gray* v. *Walker,* 157 Cal. 381 [108 Pac. 278], and cases cited.)

[3] The refusal to give the following instruction is assigned as error: "You are instructed that no mere words of accusation and insult, however profane or severe, justify an assault under the law. Therefore Mort was not justified by any words spoken by Graham to him or regarding him in assaulting Graham." The court instructed the jury on this

subject as follows: "Mere words of insult or of reproach, however grievous, will not justify an assault, a blow, or a threatening demonstration with a deadly weapon."

The refusal to give the following instructions, relating as counsel states to the law of reasonable doubt as applied particularly to the plea of self-defense, is assigned as error:

"You are instructed that when a person charged with murder sets up self-defense as a defense to the charge that the law does not require that he prove self-defense beyond all reasonable doubt, and to a moral certainty; but if it appears from all the testimony that there is a doubt that the defendant acted in self defense, then I instruct you that such doubt should be construed in favor of the defendant, and that you should by your verdict acquit the defendant."

"You are instructed that the defendant has interposed the plea of self-defense as a defense to the charge of murder in the information filed against him, and if after a consideration of all the testimony in the case there is a reasonable doubt in your minds whether the defendant was justified in acting in self defense under the immediate circumstances surrounding the shooting, then I charge you that under your oaths you are bound to give the defendant the benefit of such doubt, and by your verdict acquit him."

"You are instructed that the burden is on the prosecution to establish the guilt of the defendant by proof beyond every reasonable doubt and to a moral certainty. This rule applies to the whole and every material part of the case, and unless every fact essential to conviction, whether it is as to the act of killing or the reason for, or manner of its commission, shall be proved beyond every reasonable doubt, you must acquit the defendant. If after considering the whole case and all the evidence any one of your number shall entertain a reasonable doubt whether the homicide is excusable or justifiable or whether the defendant acted in lawful self-defense then it is the duty of such juror so entertaining such reasonable doubt to vote to acquit the defendant."

Counsel states that these instructions are founded upon the principles announced in *People* v. *Bushton,* 80 Cal. 160 [22 Pac. 127], and *People* v. *Roe,* 189 Cal. 548 [209 Pac. 560]. Those cases affirm the rule that the burden of proving circumstances of mitigation or that justify or excuse the commission of a homicide does not mean that the defendant

must prove such circumstances by a preponderance of the evidence but that he is only required to produce such evidence as will create in the minds of the jury a reasonable doubt of his guilt of the offense charged. It is not suggested that the court transgressed this rule in the instructions given. On the contrary, it was expressly recognized and applied in the following instruction which was given: "When, upon a trial for murder, the commission of the homicide by the defendant has been proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justified or excusable. It is not necessary that the defendant prove circumstances of justification, mitigation, or excuse by a preponderance of the evidence, it is only necessary that from the whole case, from all the evidence submitted, either by the prosecution or the defense, that there exists in the minds of the jury a reasonable doubt as to whether or not the defendant was justified or excusable in the killing, and if after consideration of all the evidence in the case such reasonable doubt exists in the minds of the jury then they should acquit the defendant."

An examination of the record discloses that the court very fully and correctly instructed the jury on the law of self-defense, burden of proof, and on the doctrine of reasonable doubt in substance and effect as outlined in the refused instructions, as well as on all other questions of law involved in the case.

[4] When the substance of the refused instruction was given the defendant was not entitled to a repetition of the same matter or to the adoption by the court of his own phraseology. (*People* v. *Feld,* 149 Cal. 464 [86 Pac. 1100]; *People* v. *MacPhee,* 26 Cal. App. 218 [146 Pac. 522]; 8 Cal. Jur., sec. 366.)

The evidence was sufficient to support the verdict, and no error appearing the judgment and order are affirmed.

Finlayson, P. J., and Craig, J., concurred.