[Crim. No. 5553.   In Bank.   Oct. 22, 1954.]

THE PEOPLE, Respondent, v. PATRICIA GALLAGHER
MOORE, Appellant.

Ward Sullivan, Dockweiler & Dockweiler and Frederick C. Dockweiler for Appellant.

Edmund G. Brown, Attorney General, Norman H. Sokolow, Deputy Attorney General, S. Ernest Roll, District Attorney (Los Angeles), Jere J. Sullivan, Robert Wheeler and J. Miller Leavy, Deputy District Attorneys, for Respondent.

CARTER, J.—Defendant, Patricia Gallagher Moore, appeals from a judgment of conviction of manslaughter and from an order denying her motion for a new trial. (Defendant was charged by information with the crime of murder; the jury returned a verdict of manslaughter.)

Defendant, Mrs. Moore, and the deceased, Dr. Telford I. Moore, were married in 1941. Each had been previously married and each had a child by the former marriage. Mrs. Moore's daughter, Antonia Thomas, was 15 years of age; Dr. Moore's son, Thomas, was 16 years of age. Dr. and Mrs. Moore had a son, Timmy, aged 8. In 1946, after Dr. Moore's term of military duty was at an end, the couple moved to California where Dr. Moore opened an office for the practice of ophthalmology. The couple, together with the children, lived in the rear of the office for about 15 months. Mrs. Moore worked in the office, under her maiden name, and in the home, caring for the family. In 1948, due to long hours of work and abusive treatment from her husband, Mrs. Moore had a nervous breakdown and was under the care of three psychiatrists who gave her "shock" treatments. Defendant ceased work at that time for three months but Dr. Moore brought home office books and records for her to keep at home. At about this time, Dr. Moore began giving defendant large doses of sedatives and narcotics. At this time, the couple owned quite a large home which Mrs. Moore was endeavoring to keep up with only spasmodic help. Defendant repeatedly requested permission to cease working in the doctor's office so that she might devote her entire time to caring for the home and the children. These requests were the subject of many heated and abusive arguments and were refused until approximately the first of April, 1951.

In October, 1949, another woman was hired to assist Mrs. Moore in the office, and in June, 1951, Mrs. Moore on the advice of her physicians took a trip to Hawaii with two of the children. She returned in July, 1951, having heard that her husband was associating with a Mrs. Betty Blanchard. On August 27, 1951, defendant filed an action against Dr. Moore for separate maintenance. After a hearing, the court made its order directing Dr. Moore to leave the family home, to provide for the support of defendant and the child of the couple, and prohibiting Dr. Moore from molesting the defendant. On December 7, 1951, at Dr. Moore's request, the couple entered into a reconciliation agreement and resumed marital relations. By the agreement, defendant was given the home and its furnishings. Dr. Moore moved out of the home on January 14, 1952, and recorded a notice of rescission of the reconciliation agreement. Defendant's attorney had many conferences with Dr. Moore in which he attempted, without success, to obtain funds for Mrs. Moore. Finally,

in order to enforce the court order for defendant's support, the attorney obtained, on May 6, 1952, an order to show cause why Dr. Moore should not be held in contempt of court.

The above-mentioned order to show cause was personally served the evening of May 6, 1952, upon Dr. Moore, by a private detective and a Mrs. Jones, a personal friend. Dr. Moore at that time was living in an apartment under an assumed name. The service was had on him as he left that apartment in the company of Mrs. Blanchard. Mrs. Moore was present when the service was made although Dr. Moore did not see her.

When the defendant returned to her home on the evening of May 6th, 1952, she found Patricia Silvagni, aged 16 and a schoolmate of her daughter, using the telephone. She told her to hang up so that she could make some calls. She endeavored to call Don Blanchard, the husband of Mrs. Betty Blanchard, and her attorney who was not at home. She called Mr. and Mrs. Holroyd, neighbors and one Lloyd Gregg. Just after the service on her husband, Mrs. Moore had driven to the Blanchard home in an effort to find Mr. Blanchard who was said not to be at home. After the calls had been made, the phone rang and defendant answered it. Patricia Silvagni, who was present, and who testified to the above facts, also testified that when defendant answered the phone, she heard her say "I don't want to see you," "That's why we have attorneys," "Where are you?" and that defendant then replaced the receiver. Defendant then told Patricia that Dr. Moore was coming over; that she did not want to see him; that he was in Hollywood and would arrive in about 15 minutes.. Patricia then told defendant that Dr. Moore had called while defendant was not at home and asked if she could be out serving papers; that he laughed, said he had been served with papers alleging he was behind $3,600 and directing him to be in court on May 22d; that he laughed again, asked her if she thought defendant wanted to get "this thing" over and settled. Patricia testified that she told him she knew Mrs. Moore did want to get it settled because she couldn't stand living the way she was; that Dr. Moore laughed again and said defendant was enjoying her martyrdom and didn't want to settle things; that he kept saying he thought she was crazy and demented; that he swore. She testified that she told him that the fact that he had been telling people he had his wife on a "starvation period" was not going to get things settled; that Dr. Moore replied it was the only way he could

get anything through her "numbskull"; that he was going crazy; could not stand it; had to get things settled that night; that if he did not get things settled that night he was going to Mexico the next day; that he started laughing again; that she hung up the receiver when told to do so by defendant. It was Patricia's opinion that Dr. Moore's laugh was unnatural. This conversation was related to the defendant by Patricia the night of May 6th. Thereafter, defendant told Mrs. Jones and Lydon to leave and meet her at the Blanchards; that she would bring Dr. Moore there to meet them so that the whole thing could be settled; that Patricia was to stay in Timmy's room with him. Patricia asked her if she were afraid of Dr. Moore coming to the house and defendant said she was, "that he might do anything." Defendant then went downstairs and sent the Holroyds to the Blanchards to wait for her.

After sending Patricia to care for Timmy, defendant went to her room and procured the gun which had been given her by Police Officer Sawyer for her protection. As Patricia heard the defendant going downstairs, there was a loud pounding on the front door which stopped when defendant opened it and said "hello." After the front door closed, Patricia heard some running around for about five minutes; then something like "thuds"; then a sound like someone falling to the floor, and about a second later, "or about the time I heard Mrs. Moore scream, I heard a shot."

Defendant testified that when she opened the door, she had the gun in her right hand which was hanging at her side; that she opened the door with her left hand. As she opened the door Dr. Moore rushed through the house, running from the hall into the pantry, through the dining room, back into the hall, through the pantry and again into the dining room where he hit her with his fists, knocking her to the floor so as to render her momentarily stunned and unconscious. The circumstantial evidence showed that a bullet from defendant's gun, fired from the direction where she said she was knocked down, hit the swinging door from the dining room into the pantry and ricocheted into Dr. Moore's body, passing through both walls of the aorta. Defendant testified that she tried to reach the stairs to go to her son's room so that she might lock herself in; that as she approached the stairway, she saw her husband coming toward her with his hands raised; that she closed her eyes, squeezed the gun, dis-

charging a bullet which later was found to have missed Moore and lodged in the wall; that Moore fell mortally wounded at her feet. She testified that she did not know the first shot had been fired. She called a doctor who called the police. The police testified that on the night in question, she told them that the cuts on her face (which were still bleeding) had been caused by her husband hitting her and knocking her down; that she had been afraid of her husband who had, on many prior occasions, beaten her; that she had fallen to the floor after he had hit her and had fired at him then.

The record shows that before defendant's trip to Hawaii, her husband had beaten her or hit her on several occasions. Subsequent to her return from that trip, there is evidence to show that he severely beat her several times and her daughter on one occasion; that he was given to the use of foul and abusive language when addressing her. It appears that she had private investigators trailing him; that she had a dictaphone installed in his apartment; that she told other persons that she was out to ruin him both personally and professionally. It appears, and the evidence was corroborated, that he told numerous persons that he was afraid that if he talked to her he would kill her; that when another doctor remonstrated with him for giving defendant such large doses of sodium amytol, Dr. Moore replied that he didn't care if he did kill her; that he was trying to "starve" her out. Other witnesses testified that they had seen defendant when she was bruised and lacerated from blows inflicted on her by Dr. Moore. There was evidence that Dr. Moore had told defendant he would mutilate her face; that he would return and rake her bones out of the ashes; that "they" would find her floating in the swimming pool; that he would run over her with the car. At one time, a policewoman stayed in the house with defendant to protect her from Dr. Moore and she testified that she saw him pick defendant up and throw her across the room into a chair. A former police officer, Sawyer, testified that he had given her the gun when he saw, on her person, evidence of a beating administered by the deceased and after she had told him that her husband had threatened to do away with her.

Defendant contends that the evidence is insufficient to support the verdict; that the court erred in refusing certain testimony; that the court erred in giving, and refusing to give, certain instructions.

## Insufficiency of the Evidence

■ There appears to be only one major conflict in the evidence and that relates to the firing of the fatal shot. Defendant testified that she did not know the first shot was fired; that she was conscious of only shooting once—when she was endeavoring to reach the stairs and saw deceased coming toward her with his hands upraised as if to hit her. At the trial she testified that the blow she received from her husband rendered her unconscious and that the fatal shot must have been fired during that time. The night of the crime, she told police officers that when her husband struck her, she fell to the floor and had then fired at him. The resolution of this conflict in the evidence was for the trier of fact and we must assume that they believed the testimony of the police officers as they related her story of the occurrences on the night in question when she did not say she had been unconscious from the blow she received.

## Refusal to Admit Certain Testimony

It was defendant's position that at the time she shot her husband she was acting in necessary self-defense. She sought to introduce the testimony of Dr. Harvey Billig that during the year 1950, her husband had placed her under his care; that he had found her in a very run-down condition due to glandular disturbances which caused her to be emotionally unstable and that he had turned this information over to her husband. An offer of proof was made that it would be shown by other medical testimony that her condition as of 1950 continued until the time of the shooting. The testimony was refused on the theory that it was defendant's physical condition as of the time of the crime that was material and relevant; "that the condition existing a year and a half or two years prior does not shed light upon any of those issues. In other words, it seems to me that it is immaterial. The objection will be sustained on that ground." The court then sustained the objection on the ground that it was immaterial "at this stage of the trial." Defense counsel then excused the witness, Dr. Billig, subject to being returned upon telephone call if necessary to which the court replied that it would be "satisfactory." ■ ". . . 'Where the court rejects evidence temporarily or withholds a decision as to its admissibility, the party desiring to introduce the evidence should renew his offer, or call the court's attention to the fact that a definite decision is desired.'" (*Spanfelner* v. *Meyer*, 51

Cal.App.2d 390, 392 [124 P.2d 862]; *People* v. *Hatch,* 163 Cal. 368, 377 [125 P. 907].) ▮ Other testimony as to the defendant's physical condition over the years was admitted in evidence and while the testimony of Dr. Billig would have been admissible under the rule of *People* v. *Smith,* 151 Cal. 619 [91 P. 511], relied upon by defendant, it does not appear that its exclusion could have prejudiced her in any way.

### INSTRUCTIONS ALLEGEDLY ERRONEOUSLY GIVEN

"The law does not permit or justify one who intends to commit an assault upon another to design in advance his own defense by instigating a quarrel or a combat with a view thereby to create a situation wherein the infliction of the intended injury will appear to have been done in self-defense."

"Where a person seeks or induces a quarrel which leads to the necessity in his own defense of using force against his adversary, the right to stand his ground and thus defend himself *is not immediately available to him,* but, instead he first must decline to carry on the affray, must honestly endeavor to escape from it, and must fairly and clearly inform his adversary of his desire for peace and of his abandonment of the contest. Only when he has done so will the law justify him in thereafter standing his ground and using force upon his antagonist."

The above-quoted instructions were given at the request of the People. It is conceded that they are correct statements of abstract propositions of law, but it is argued that there was no evidence in the record that defendant sought or induced a quarrel with deceased. It is argued that Dr. Moore had been restrained by court order from molesting defendant; that the house had been given to her; that Dr. Moore called defendant and told her, over her protests, that he was coming to see her; that he ran through the house and that he struck her causing her to fall to the floor before the shot was fired. On the other hand, it is argued that defendant met him at the door with a gun.

### INSTRUCTIONS REQUESTED AND ALLEGEDLY ERRONEOUSLY REFUSED

(1) "If the jury believe from the evidence that Telford Moore attempted to and was about to commit an assault upon the defendant and that at the time he did so the defendant had a right to repel and resist the assault of Telford Moore and use all necessary force to repel the same."

(2) "You are instructed that an assault is an unlawful attempt coupled with a present ability to commit a violent injury on the person of another.

"If you believe from the evidence, or if you entertain a reasonable doubt therefrom, that decedent was the aggressor in the affray, or that he assaulted the person of the defendant, then the defendant was entitled under the law to invoke the aid of self defense and in so doing she had the right to lawfully resort to such means and force as to her may have appeared necessary under all the circumstances as a reasonable person to repel or resist the same.

"If after a careful consideration of all the evidence, you should believe therefrom, or if you should entertain a reasonable doubt therefrom, that the defendant herein was the victim of an assault at the hands of decedent or if you believe that the defendant at that time, as a reasonable person honestly and in good faith believed herself to be the victim of such an assault, although you might find that she was in fact mistaken, then you are instructed that she was entitled to act upon such appearances with safety and defend herself, although it may afterwards have been shown that the appearances were not justified by the facts."

(3) "If the jury believe from the evidence that Telford Moore was the first aggressor in the difficulty which resulted in what occurred, then the defendant was not obliged to fly or run, but had the right to stand her ground and repel any assault or threatened assault."

The trial court gave three instructions on the right of self-defense which defendant concedes to be fair and impartial statements of the law on that subject. ██ The failure to give the above three instructions is claimed to be prejudicial error when coupled with the instructions given on the subject at the request of the prosecution. Those two instructions, it is claimed, state the position of the People and since they were given, in order to achieve impartiality, the two requested by defendant should have been given. The court gave, in all, 20 general instructions on self-defense most of which impartially state the law on the subject. In addition, the two "prosecution-slanted" instructions which have been heretofore quoted were given. It would appear that the court's refusal to give the two "defense-slanted" instructions could not, alone, have so prejudiced defendant as to warrant a reversal of the judgment.

*Instructions given which allegedly magnified the error:*

(A) "The court further instructs the jury that if from the evidence you believe that, without any overt act or physical demonstration on the part of the deceased, Dr. Telford Ira Moore, sufficient to warrant the defendant, as a reasonable person, in believing that she was in great bodily danger, she, the defendant, committed an assault with a deadly weapon upon Dr. Telford Ira Moore, such use of a deadly weapon under such circumstances would not be justifiable."

(B) "To justify the use of a deadly weapon, upon another in self defense, it must appear to the defendant, as a reasonable person, that the danger, if any, was so urgent and pressing that in order to save her own life or to prevent her receiving great bodily harm, the use of the deadly weapon by the defendant was necessary. And it must appear that the adversary, upon whom the deadly weapon was used, was the assailant or, if not the assailant, that the defendant had really and in good faith endeavored to decline further trouble before resorting to the use of a deadly weapon upon her adversary."

■ Under the circumstances of this case, where self-defense is relied upon, and where the question of whether Dr. or Mrs. Moore was the aggressor is one of the major issues, if not the major issue, in the case, it would appear that the giving of the two instructions stated from the viewpoint of the prosecution and the failure to give the two requested by the defendant, could have constituted a weighting of the scales in favor of the People. As was said in *People* v. *Hatchett*, 63 Cal.App.2d 144, 158 [146 P.2d 469], where a conviction of manslaughter was reversed and where almost identical instructions were given at the request of the People: "It is true that the four instructions given at the request of the People do not incorrectly state the law of self-defense, but they stated the rule negatively and from the viewpoint solely of the prosecution. To the legal mind they would imply that actual or positive danger need not exist in order to justify self-defense, but that principle should not have been left to implication. The difference between a negative and a positive statement of a rule of law favorable to one or the other of the parties is a real one, as every practicing lawyer knows. The rules of law relating to self-defense should not have been stated exclusively from the viewpoint of the prosecution. There should be absolute impartiality as between the People and the defendant in the matter of instructions, in-

cluding the phraseology employed in the statement of familiar principles. Of instructions that had been given by the court, and which we find upon examination of the original record were identical with the four we have last quoted, the court said in *People* v. *Estrada* (1923), 60 Cal.App. 477, 483 [213 P. 67] : 'The instructions of the court taken as a whole must be said to correctly state the law. While conceding this, it may be added that in their tenor the instructions of the court were critical of the self-defense claim. The court might well have given more comprehensive instructions on the right of self-defense as viewed from the standpoint of the accused.' It would seem that the criticism of the instructions in the Estrada case, which came up from Los Angeles County, called for their revision and the use of instructions on self-defense which stated the law with complete impartiality. In addition to the foregoing instructions on justification, the court gave another reading as follows: 'The Court instructs the jury that if from the evidence you believe that, without any overt act or physical demonstration upon the part of the deceased sufficient to warrant the defendant, as a reasonable person, in believing that she was in great bodily danger, she, the defendant, fired the fatal shot at deceased and killed him, such killing under such circumstances was not justifiable.' [This instruction is almost identical with (A) just set forth.] This instruction was wholly unnecessary and it emphasized the fact that the court was viewing the claim of self-defense exclusively from the viewpoint of the prosecution. If we were considering any one of these instructions separately, even including the last one, the harm would not be so serious, but the five instructions together, we think, in the absence of a statement of the law of self-defense from the viewpoint of the defendant, tended to create the impression in the minds of the jury that the judge was of the opinion that self-defense had not been established.'' In the case at bar, the court emphasized the point of view of the People by using Dr. Moore's name in the instruction and this was compounded by the failure to give any instruction on the subject from the viewpoint of the defendant.

(4) The following instruction was requested, but not given. It is claimed that the evidence amply supported the instruction and that the failure to give it substantially prejudiced the defendant's rights. It is admitted that no instruction on the subject was given.

''You are instructed that if you believe from the evidence

that prior to the 6th day of May, 1952, the defendant Patricia G. Moore had received information either from the deceased or other persons, of threats against her life or person made by the deceased Telford I. Moore she is justified in acting more quickly and taking harsher measures for her own protection in event of assault, than would a person who had not received such threats and if you should believe from the evidence that the deceased did make threats against the defendant and because thereof defendant had reasonable cause to fear greater peril than she would have had otherwise, you are to take such facts into consideration in determining whether defendant acted in a manner which a reasonable person would act in protecting his or her own life or bodily safety.''

There was ample evidence in the record to justify giving the above instruction which was held a proper one in *People* v. *Graham*, 62 Cal.App 758, 765 [217 P. 823], and *People* v. *Bradfield*, 30 Cal.App. 721, 727 [159 P. 443]. A judgment of conviction of second degree murder was reversed in *People* v. *Torres*, 94 Cal.App.2d 146 [210 P.2d 324], because of the failure to give the same instruction. It was said there, ''It is conceded that no instruction was given with respect to the influence of antecedent threats on the right of self-defense. Where, as in this case, there is evidence tending to show the making of threats of death or great bodily harm by deceased against the defendant, which are relied on as influencing or justifying defendant's act, instruction on the law of this subject is proper (41 C.J.S., Homicide, § 382, p. 185) and if not covered a correct instruction on the subject proposed by one of the parties should be given. . . . [T]he proposed instruction would not tell the jury that under the circumstances mentioned the defendant would be justified in committing an assault with a deadly weapon in self-defense, but only that the jury was 'to take such facts and circumstances into . . . consideration in determining whether the defendant acted in a manner in which *a reasonable man* would act in protecting his own life or bodily safety.' Moreover, the well known rule that each instruction need not contain a complete statement of the law but that it is sufficient that all instructions taken together correctly do so, applies obviously also to instructions proposed by a party and refused. Many more instructions on self-defense were proposed and many were given. The jury were instructed in the language of section 197, subdivision 3, Penal Code, that homicide is justifiable in self-defense 'when there is reasonable ground to apprehend

a design to commit a felony or to do some great bodily injury, *and imminent danger of such design being accomplished.'* The standard of the reasonable man both as to the fear of danger and the measures to be taken in defense was repeatedly called to their attention. To such instructions the one proposed on previous threats was a correct supplement that should have been given. . . . In a close case with strongly conflicting evidence as the one before us the refusal of the instruction requires reversal."

In the present case while the evidence was practically without conflict, the inferences to be drawn therefrom were diametrically opposed. Defendant armed herself when she discovered her husband insisted on seeing her that night; she sent her friends away over their opposition; she sent the girl Patricia to stay with her son. On the other hand, deceased had insisted on coming for a showdown; he had, on many previous occasions, not only beaten and assaulted her, but had threatened her with different types of bodily injury and death and, on the evening in question, did in fact assault her. The People contend that because defendant was armed, she was the aggressor. The defense relies on the theory of self-defense and, in view of the facts presented, as heretofore pointed out the question of which one of the two was the aggressor was of vital importance in the case. The jury should have been instructed on the possible influence of antecedent threats so far as the conduct of defendant in arming herself with the deadly weapon on the night in question was concerned.

### Instruction Allegedly Erroneously Given

"The right of self-defense exists only as against an unlawful attack. The right does not exist, even though bodily injury appears probable, as against a person who, in threatening or appearing to threaten injury, is acting lawfully."

 It is argued that there is no evidence in the record to support the latter part of this instruction; that there is no evidence to show that deceased, on the night in question, was acting lawfully. Dr. Moore was restrained by court order from molesting his wife; he came to the house in violation of the order and over her protests that she did not want to see him. When he arrived, he pounded the door; upon gaining entrance, he ran through the rooms in the lower part of the house and assaulted his wife. It is argued by defendant that the instruction invited the jury to "speculate" and left the

door open for surmise and conjecture; that its effect was to implant on the jury the belief that the court was of the opinion that decedent, at the time of the shooting was acting in a lawful manner and that defendant's claim of self-defense had no basis in fact. Defendant's argument with respect to this instruction seems meritorious. The People counter with the statement that even if the deceased were not acting in a lawful manner on the night in question the instruction told the jury that the right of self-defense exists only against an *unlawful* attack. It is true that the first sentence so states, however, the second sentence and major part of the instruction deals with a person threatening bodily injury who is acting *lawfully* and informs the jury that the right of self-defense does not then exist. We find no support in the record for the second part of the instruction. The home belonged to defendant who had told her husband she did not want to see him on that night. It is true that subsequently she told her friends to leave because her husband might not stop if he saw their cars in front of the house, but so far as the deceased knew when he arrived, he was coming in violation not only of her wishes but of a court order prohibiting him from molesting her. His conduct after entering the house could not be said to be indicative of a law-abiding nature. █ An instruction which finds no support in the record, even though a correct statement of an abstract proposition of law, is improper when it finds no support in the evidence, and it is ground for reversal if it is calculated to mislead the jury (24 Cal.Jur. 831, 832). In *People v. Silver*, 16 Cal.2d 714, 723 [108 P.2d 4], we said: "Where errors in instructions occur, the question always arises as to whether or not they are prejudicial. Here it may be said that where the proof of a defendant's guilt is clear, and no extenuating circumstances appear, such errors may not be prejudicial. But where a case, such as the one at bar, is what may be termed a 'close' case, and where the erroneous instructions concern matters vital to the defense of the defendant, and may have resulted in a miscarriage of justice, we are of the opinion that such errors must be regarded as prejudicial and should result in a new trial for the defendant." (*People v. Hamilton*, 33 Cal.2d 45 [198 P.2d 873]; *People v. Thomas*, 25 Cal.2d 880 [156 P.2d 7]; *People v. Weatherford*, 27 Cal.2d. 401 [164 P.2d 753].)

In summary, we find that two instructions on self-defense were given from the viewpoint of the prosecution and, while numerous instructions on that subject were given, no one of

them could be said to have been stated favorably to the defense, or from that point of view. An instruction on the influence of antecedent threats was requested by the defendant and refused by the trial court. Such an instruction found ample support in the record. An instruction which told the jury that the right of self-defense did not exist as against a person "who, in threatening or appearing to threaten injury, is acting *lawfully*" was given without support in the evidence.

We are of the opinion that where the evidence on the issue of which of the parties was the aggressor is as closely balanced as it is in this case and where there was error in the giving and refusing of instructions on the vital matter of self-defense on the part of the defendant that may have resulted in a miscarriage of justice, it must be concluded that the error was prejudicial and should result in a reversal of the judgment and the order denying defendant a new trial. (*People* v. *Silver,* 16 Cal.2d 714, 723 [108 P.2d 4] ; *People* v. *Hamilton,* 33 Cal.2d 45 [198 P.2d 873] ; *People* v. *Weatherford,* 27 Cal.2d 401 [164 P.2d 753].)

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are reversed.

Gibson, C. J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I dissent. In my opinion, examination of the entire record in this case impels the conclusion that no error of any substance appears, that the evidence strongly supports the verdict, and that no miscarriage of justice has occurred.

Much of the lengthy reporter's transcript is devoted to a picture of the domestic relations of defendant and Dr. Moore prior to the killing of Dr. Moore on May 6, 1952. The discord between them increased after defendant returned from Hawaii in July, 1951, instituted her separate maintenance action against Dr. Moore, and hired detectives to follow Dr. Moore and to obtain recorded evidence against him. It appears unnecessary to recount details of the various verbal and physical altercations between defendant and Dr. Moore which appear in the record and a number of which are referred to in the majority opinion.

It may be mentioned that the majority opinion states, "A former police officer, Sawyer, testified that he had given her the gun [which defendant thereafter used to shoot Dr. Moore] when he saw, on her person, evidence of a beating

administered by the deceased and after she had told him that her husband had threatened to do away with her.'' Sawyer, who became acquainted with defendant when he was privately employed by her to obtain recordings of Dr. Moore's conversations with defendant and with Mrs. Blanchard and to ''tail'' Dr. Moore, testified that he loaned defendant the gun because she complained of prowlers. Defendant testified that she had not complained of or had prowlers; that Sawyer gave her the gun for ''protection'' after they spoke of ''some of Toni's [Mrs. Moore's 15-year old daughter's] friends who had jumped over the back fence.''

The evidence as to the events of October 6, 1951, which culminated in the death of Dr. Moore overwhelmingly tends to negative defendant's claim of necessary self-defense. As indicated in the majority opinion, after defendant talked with Dr. Moore on the telephone on the evening of the 6th, and knew that he intended to come to her house, she asked Mr. Lydon, a private detective employed by her, and Mrs. Jones, a friend, to move their cars from in front of her house because, defendant said, Dr. Moore would not stop if he saw them. When defendant's friends the Holroyds shortly thereafter arrived at her house, she asked them to go to the Blanchards, who lived near by, and said that she would bring Dr. Moore and they would have a ''showdown.'' Defendant then told Patricia Silvagni, the young school friend of Toni who was living with them, to go upstairs and not allow Timmy, the child of Dr. and Mrs. Moore, to come downstairs while his father was there. Defendant then got the gun, went downstairs with it, and answered Dr. Moore's knock with it in her hand.

After she had shot Dr. Moore defendant went to the telephone. She did not call the police or an ambulance, or call to Patricia Silvagni upstairs, but telephoned her friends Dr. Doty and Dr. Wells, her attorney, and Mrs. Blanchard. To Dr. Doty she said, ''George, this is Pat. I have just done it''; Dr. Doty asked, ''You have done what, Pat?''; she answered, ''I have shot Telford.'' Defendant in her conversation with Mrs. Blanchard called the latter a ''lowdown bitch'' and told her to send all defendant's friends back to the Moore house.

Although defendant stated and testified that she recalled firing only one shot, it was indisputably proved by physical evidence that two shots had been fired; that the lethal bullet was fired from the dining room toward the swinging door be-

tween the pantry and dining room, hit the door as it swung out toward the dining room, then ricocheted into Dr. Moore's chest from the side; that Dr. Moore finally fell wounded in the entrance hall just past the swinging door from the pantry; and that a second shot was fired from the entrance hall and hit the wall of the hall just above the spot where Dr. Moore fell.

Reasonable inferences from the physical and testimonial evidence are that after Dr. Moore entered the house he ran to escape defendant's gun; that his assault on defendant was made in an attempt to disarm her; that the lethal shot was fired not when Dr. Moore was facing defendant but when he had his back at least partially toward her and was going away from her from the dining room into the pantry; that after the bullet had ricocheted into his chest, he went on through the pantry and into the entrance hall, where he fell; that defendant stepped through the opening from the dining room into the entrance hall, fired the second shot while Dr. Moore was still upright in the entrance hall, missed him, and hit the wall above him.

The jury were fully warranted in determining—and on this appeal we are bound to accept the fact that they did determine—that on the evening of the killing defendant armed herself to meet Dr. Moore while she was in a jealous rage at his asserted affair with Mrs. Blanchard and was determined to force Dr. Moore to go to the Blanchards for a "showdown"; that if at any time before Dr. Moore arrived defendant was in fear, she could have barred the entrance to the house, called the police, or recalled the people she had told to go to the Blanchards, but that she rejected these choices; that if the doctor struck defendant before he was shot, he did so to protect himself and in an attempt to disarm defendant; that the armed defendant did not act in necessary self-defense when she killed the unarmed Dr. Moore.

Contrary to defendant's position, the record reveals ample evidence which supports the giving of the instructions, concededly correct statements of law, quoted in the majority opinion at page 524. From the evidence it could be inferred that defendant, not Dr. Moore, was the original aggressor in the affray. She expressed a determination that Dr. Moore should confront the wronged husband of his asserted paramour, which she must have realized he would be unwilling to do. After expressing her lack of fear of Dr. Moore, refusing the aid of her friends, and carefully clearing

her house of potential witnesses, she armed herself with a gun and displayed it when she opened the door to Dr. Moore. There is overwhelming evidence (some of it from defendant herself and from recordings made by her) that in previous quarrels with the doctor, defendant had not merely persisted in provocative abuse but had instigated the use of physical violence and had made no effort to terminate the altercations. The jury were justified in inferring that in this as in previous altercations Mrs. Moore's conduct was designed to provoke rather than to avoid an affray.

As appears from the majority opinion, defendant complains of the refusal of instructions requested by her, quoted at pages 524, 525 of that opinion, which are phrased in terms of the law applicable "If the jury believe from the evidence that Telford Moore attempted to and was about to commit an assault upon defendant" and "If the jury believe from the evidence that Telford Moore was the first aggressor." Instructions which the trial court gave on the subject of self-defense[1] adequately and fairly cover the law on the subject and are properly phrased to apply to whomever the jury considered the instigator of the affray.

Defendant asserts that the giving of the instructions quoted at pages 525, 526 of the majority opinion unduly emphasized the prosecution point of view, and the majority, without suffi-

---

[1]The trial court gave the following instructions:

"It is lawful for a person who is being assaulted, and who has reasonable ground for believing that bodily injury is about to be inflicted upon him, to stand his ground and defend himself from such attack, and in doing so he may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

"A person who has been attacked and who is exercising his right of lawful self-defense is not required to retreat, and he not only may stand his ground and defend himself against the attack but may also pursue his assailant until he has secured himself from danger if that course appears to him, and would appear to a reasonable person in the same situation, to be reasonably and apparently necessary; and this is his right even though he might more easily have gained safety by withdrawing from the scene."

"A person who without fault on his part is exposed to a sudden felonious attack need not retreat. In the exercise of his right of self-defense he may stand his ground and defend himself by the use of all force and means apparently necessary and which would appear to be necessary to a reasonable person in the same situation and with the same knowledge; and he may pursue his assailant until he has secured himself from danger if that course likewise appears reasonably necessary. This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene."

cient analysis, accept this argument. Defendant relies upon *People* v. *Estrada* (1923), 60 Cal.App. 447, 483 [213 P. 67], and *People* v. *Hatchett* (1944) 63 Cal.App.2d 144, 158-159 [146 P.2d 469], which emphasize that instructions should be not merely correct but also impartial in their point of view. That principle, of course, is true and should be strictly adhered to by trial courts. In the Estrada case, however, the appellate court concluded that the prosecution evidence showed that defendant acted only in self-defense, and in the Hatchett case there was evidence strongly tending to show that defendant acted in self-defense and the charge to the jury not only emphasized the prosecution's point of view in the instruction as to self-defense but also contained various errors which, the appellate court concluded, in combination required reversal. In the present case the charge as a whole is not "prosecution slanted" and there is evidence which strongly tends to show that the killing terminated the last of a long series of altercations which were instigated at least as much by defendant as by the husband she killed.

The majority opinion accepts defendant's argument that the failure to give the requested instruction quoted at pages 527, 528 of that opinion substantially prejudices defendant. The instruction, omitting the matter italicized and enclosed in brackets, was as follows: "[I]f you believe from the evidence that prior to the 6th day of May 1952, the defendant Patricia G. Moore had received information, either from the deceased or other persons, of threats against her life or person made by the deceased Telford I. Moore [*and believed such threats or was thereby made more apprehensive of harm*] she is justified in acting more quickly and taking harsher measures for her own protection in event of assault, than would a person who had not received such threats and if you should believe from the evidence that the deceased did make threats against the defendant and because thereof defendant had reasonable cause to [*and did*] fear greater peril than she would have had otherwise, you are to take such facts into consideration in determining whether defendant acted in a manner which a reasonable person would act in protecting his or her own life or bodily safety."

Obviously the instruction as requested, lacking the qualifying element that the threats, if made and communicated to defendant, were believed by her or at least made her more apprehensive of peril, is not a complete and accurate statement of law. (*People* v. *Gonzales* (1887), 71 Cal. 569, 576

[12 P. 783]; *People* v. *Glover* (1903), 141 Cal. 233, 238 [74 P. 745]; *People* v. *Hagemann* (1949), 90 Cal.App.2d 748, 751 [203 P.2d 830].) The record, however, tending as it does to show that both defendant and deceased had at one time or another made threats against the other, fully justified instruction on the law of self-defense and on the possible effect of threats, and the trial court did give the instructions next hereinafter quoted which cover accurately the principles governing the right to take life in self-defense. Such principles, it will be noted, include the right to act as a reasonable person upon ''what such person in real or apparent danger knows and sees,'' upon ''the appearance of peril'' and on ''an honest conviction and fear'' of death or ''great bodily harm,'' whether the ''danger is real or merely apparent.'' The instructions given on this particular subject differ from the one requested by defendant in that the given instructions contain the element (of belief or increased apprehension) omitted from the requested instruction and do not specifically mention the making of threats or hypothetically translate those principles into a formula instruction applicable only on a resolution of the evidence favorable to the defendant. Such instructions, as given, are as follows:

''The law of self-defense is founded on the principle of necessity, either actual or apparent, and in order to justify the taking of human life on this ground the slayer, as a reasonable person, *must have reason to believe and must believe that there is a danger of receiving great bodily harm*; and further, the circumstances must be such that an ordinarily reasonable person, *if such person were in those circumstances and if such person knew and saw what such person in real or apparent danger knows and sees,* would believe that it was necessary for such person to use, in one's defense and to avoid great bodily injury to one's self, such force or means as might cause the death of the adversary.'' (Italics added.)

''*You will note that actual danger is not necessary to justify self-defense.* If one is confronted by the appearance of peril which arouses in his mind, as a reasonable person an honest conviction and fear that he is about to suffer death or great bodily harm, and if a reasonable man in a like situation, seeing and *knowing the same facts, would be justified in believing himself in like danger,* and if the person so confronted acts in self-defense upon such appearances and from *such fear and honest convictions,* his right of self-defense is the same whether such danger is real or merely apparent. Even if in the light of after-acquired information

or from the distance and perspective of the jury box it should appear that there was no actual or only slight danger, that fact would not affect the right of self-defense if the appearances establishing that right, as I have stated them, existed." (Italics added.)

In *People* v. *Torres* (1949), 94 Cal.App.2d 146, 151, 153 [210 P.2d 324], it was held that under the circumstances of that case the refusal of an instruction as to the possible effect of antecedent threats was ground for reversal. But in that case the trial court does not appear to have given any instruction, such as those last hereinabove quoted, covering the right to act upon known facts as well as currently surrounding circumstances; indeed, to the contrary in that case the instruction as to the right to act in self-defense appears to have been related to "the *immediate* circumstances surrounding the encounter" and the court in its ruling stated that "as there could be no certainty that . . . the expression 'immediate circumstances' would not divert their [the jury's] attention from the previous threats, the giving of the prepared instruction telling them to consider the previous threats was made more important." Furthermore, in the Torres case it does not appear that the court's attention was directed to or that it considered any failure of the requested instruction to require that the defendant actually believe or be made more apprehensive by the communicated threat. It is also noted that the instruction approved in the Torres case is taken from one which had been given in *People* v. *Graham* (1923), 62 Cal.App. 758, 765 [217 P. 823]. In the Graham case, however, the instruction was not held to be a necessary or even proper one to be given; it was merely held in affirming the judgment of conviction that "The instructions . . . given sufficiently covered the subject."

While the trial court in the present case could well have modified the proposed instruction to include the elements of bona fide belief in the threats or some measure of apprehension added thereby, in my opinion it cannot properly be held that the court erred in denying such instruction in the form requested. To have given it as requested would have created a conflict between it and the instruction which was given that "The law of self-defense is founded on the principle of necessity, either actual or apparent, and in order to justify the taking of human life on this ground the slayer, as a reasonable person, must have reason to believe *and must believe* that there is a danger of receiving great bodily harm."

In any event it appears that the entire charge to the jury on the subject of self-defense was fair and in general substance sufficient, and the refusal of this particular instruction, and the failure to modify it and give it as modified, cannot reasonably, on the entire record, be held to establish a miscarriage of justice and to constitute reversible error. (See *People* v. *Cruse* (1914), 24 Cal.App. 497, 501 [141 P. 936].)

The majority opinion concludes that there is no support in the record for the second sentence of the following instruction given by the trial court: "The right of self-defense exists only as against an unlawful attack. The right does not exist, even though bodily injury appears probable, as against a person who, in threatening or appearing to threaten injury, is acting lawfully." On the contrary, there is evidence tending to show that if Dr. Moore assaulted defendant, he did so in a vain attempt to disarm her and save his own life; that defendant initiated a show of violence by displaying the gun; that she created a situation in which Dr. Moore, rather than defendant, might have the justification of acting in self-defense.

Defendant refers to her testimony that Dr. Moore ran through the house, swore at her, and struck her, asserts that he was acting in violation of the order by which he was enjoined from molesting her, and says, "Where, we ask, is this evidence susceptible of an inference that he was acting lawfully." Although defendant's description of the events immediately preceding the killing does not indicate that Dr. Moore was acting lawfully, there is, as previously pointed out, other evidence from which the jury could, and under established law we should presume did, infer that she deliberately incited the affray and did not thereafter put herself in a position where she was justified in using deadly force, and that Dr. Moore struck defendant in an effort to disarm her. On such entirely tenable view of the evidence the last quoted instruction is not an erroneous statement of law.

Defendant complains of the playing before the jury of tape recordings of conversations between the defendant and deceased. When she first raised this point on appeal she asserted that the recordings were in part inaudible and unintelligible. She relied upon *People* v. *Stephens* (1953), 117 Cal.App.2d 653, 660 [256 P.2d 1033], where it was held that "to be admissible in evidence, the conversations as recorded, should be audible and intelligible. And if not, the witness who had the conversations should be called to testify." In

the Stephens case it appeared from the record and the prosecuting attorney himself said that "a considerable portion" of the recordings was not intelligible. In the present case the trial court told the jury that if any juror wished any portion of the recordings played back it would be done, but the jury made no such request; after the recordings were played the prosecuting attorney asked defendant, "Is that a fair transcription of what can be heard of what was done and said at that time?" and she testified that it was. Defendant's objection that the recordings were unintelligible was advanced for the first time after she had taken her appeal.

The original reporter's transcript of the recordings as played in the courtroom is interspersed with asterisks; according to a subsequently filed affidavit of the court reporter, the asterisks were used to indicate both omissions of words which he could not transcribe and to designate pauses; the reporter further avers that when he listens to a recording without occasion to report it he can grasp its meaning without ascertaining each word, but that in listening to a recording as a reporter and attempting to coordinate his hearing, understanding, and reporting, his task is more complex and his understanding is below the standard of court reporting.

After the defendant advanced the contention on appeal that the recordings should not have been played before the jury because they were unintelligible, the People presented to the trial court a more complete transcript of the recordings which had been prepared after the reporter had heard and reported a replaying of the recordings; the prosecuting attorney offered defendant's counsel an opportunity to listen to the recordings again and compare them with the proffered transcript; defendant's counsel declined to do so; and the trial court on the People's motion ordered that the more complete transcript be substituted for the transcript of the courtroom notes.

The People then obtained an order of the District Court of Appeal[2] for augmentation of the record by supplemental reporter's and clerk's transcripts of the last mentioned trial court proceedings. Thereafter defendant moved the District Court of Appeal to strike the supplemental transcripts from the record, and this motion is now before us.

It does not appear that the playing of the recordings (which, it will be remembered, were caused to be made by defendant)

---

[2]At the time of the motion the cause was pending before the District Court of Appeal. It has since been transferred to this court.

before the jury was improper, or that it was improper to substitute in the record the more complete transcript of such recordings. As to the substance of the matters recorded, the original reporter's transcript, the supplemental reporter's transcript, and defendant's testimony all show that defendant instigated quarrels with Dr. Moore and that upon such instigation he struck defendant. It is the fact of the altercations, together with the fact that they were deliberately instigated by defendant, which was important to the jury's appraisal of the recordings. The precise identification of each and all of the words which were spoken by defendant and deceased is not of importance; there is no claim by defendant, and no indication in the record, that the exact phraseology of the disputes could affect the jury's disposition of the question whether the killing, some nine months later, was justified.

For the reasons above stated the motion to strike the supplemental transcripts should be denied; the judgment and order appealed from should be affirmed.

Shenk, J., and Edmonds, J., concurred.

Respondent's petition for a rehearing was denied November 17, 1954. Shenk, J., Edmonds, J., and Schauer, J., were of the opinion that the petition should be granted.