Filed 3/30/15  P. v. Swan CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW SWAN,<br><br>    Defendant and Appellant. | A137531<br><br>(San Francisco County<br>Super. Ct. No. 215146) |

On July 25, 2010, Matthew Swan cut the face of Ernest Baxter with a knife, delivering a life-threatening wound.  Baxter was an intoxicated African-American panhandler who may have made threats to a woman who accompanied Swan.  The People charged Swan with (1) assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[1]; (2) mayhem (§ 203); and possession of nunchucks,[2] which were found when his apartment was searched.  The court dismissed the charge of mayhem before the case was submitted to the jury.  The jury found Swan guilty on the assault charge, rejecting his theory of self-defense or defense of others, and not guilty on the charge of possessing nunchucks.  The court sentenced Swan to 12 years in state prison.

---

[1] Further statutory citations are to the Penal Code, unless otherwise indicated.

[2] Section 12020, subdivision (a)(1), prohibited the possession of "nunchaku," defined in subdivision (c)(3) as "an instrument consisting of two or more sticks, clubs, bars or rods to be used as handles, connected by a rope, cord, wire, or chain, in the design of a weapon used in connection with the practice of a system of self-defense such as karate."  Section 12020 has since been repealed. (Stats. 2010, ch. 711, § 4.)  Possession of nunchaku is now prohibited by section 22010.

1

Swan first contends that the trial court erred by allowing an in-custody informant to testify concerning statements that Swan made in prison—statements tending to show that his actions were motivated by white supremacist beliefs rather than by fear of imminent harm to himself or others. We find no merit in Swan's argument.

Swan next maintains that testimony that he had authored racist graffiti on a prior occasion was wrongly admitted into evidence. If it was error to admit that evidence (a question we do not reach), the error was harmless.

Swan argues that the court committed five instructional errors. We agree with Swan regarding two of his assertions of error, but conclude that those errors were harmless.

Swan also contends that he received ineffective assistance of counsel because there was no motion to sever the charge that he possessed nunchucks. We conclude that Swan's counsel made reasonable tactical choices and that Swan was not prejudiced.

Finally, Swan contends that we should reverse on the ground of cumulative error. We conclude that the errors that occurred were harmless, whether considered individually or together, and affirm.

## BACKGROUND

### I. *Procedural Background*

On April 18, 2011, the People filed an information charging Swan with three counts: (1) assault with a deadly weapon (not a firearm) (§ 245, subd. (a)(1)); (2) mayhem (§ 203); and (3) possession of nunchucks[3] (§ 12020, subd. (a)(1)). An allegation of great bodily injury pursuant to section 12022.7, subdivision (a), accompanied count 1. An allegation of use of a deadly weapon pursuant to section 12022, subdivision (b)(1), accompanied count 2. The information alleged previous convictions pursuant to sections 667, subdivisions (a)(1), (d) and (e), and 1170.12, subdivisions (b) and (c). It also

---

[3] The information originally alleged that Swan had illegally possessed a knife. The People described this as a clerical error and moved for correction. The court amended the information to replace the word "knife" with "nunchucks" on January 18, 2012.

2

alleged a prior felony with a state prison sentence pursuant to section 667.5, subdivision (b).

Presentation of evidence before a jury commenced on June 7, 2012. After the prosecution case was complete, Swan moved for acquittal on counts 2 and 3 pursuant to section 1118.1. The court granted the motion as to count 2.

On June 22, 2012, the jury found Swan guilty on count 1 and found the allegation of great bodily injury to be true. The jury found him not guilty on count 3.

On December 20, 2012, the court sentenced Swan to 12 years in state prison: the low term of two years on count 1, doubled to four years because of Swan's prior strike; plus three years for the section 12022.7, subdivision (a) enhancement; plus five years for the section 667, subdivision (a) enhancement.

Swan timely filed a notice of appeal on January 7, 2013.

## II. *Factual Background*

On Sunday, July 25, 2010, Swan left a methadone clinic in San Francisco with his friends Helen Wenzel and Armando Ibarra. Wenzel and Ibarra had met Swan about four years before and had known Swan's wife, who had recently passed away. Wenzel said that after her passing, Swan was "always crying, very upset." Ibarra has trouble walking, so Wenzel and Swan were assisting him.

The trio went to a Safeway, and Swan bought some yogurt. From Safeway, they proceeded through a plaza in the vicinity of O'Farrell and Fillmore Streets at about 2:00 p.m.

Aaron Virruet was seated in the plaza and noticed Baxter[4] 10 to 15 minutes before Swan, Wenzel and Ibarra arrived at the scene. He described Baxter as a tall, thin African-American who appeared "dirty, scroungy," a "homeless looking type," and under the influence "of something." Baxter was talking loudly to himself and walked around in a circle, with his hand out asking for change. Virruet saw him approach five or six

---

[4] Baxter did not testify at trial because the district attorney's office had been unable to locate him.

3

people, but he saw no aggressive action on Baxter's part, though Baxter did hit a sign at one point.

Wenzel testified that as she, Ibarra and Swan entered the plaza, Baxter "popped out of nowhere" from behind them and it "scared the hell out of" her. Baxter "was waving his hands all over and in [her] face and behind [her]." According to Wenzel, Baxter was "slobbering, foaming at the mouth" and "was just nuts." Swan told Wenzel, "Just let him go. And let's just keep going, just forget about him and keep walking." They proceeded ahead and Baxter told Wenzel that "he was going to kick [her] in the f'ing head" and called her a "white witch." Wenzel said, "He was getting really—just like he wanted to kill me" and came towards her as if he were going to kick her in the head.[5] Wenzel turned away and "grabbed" Ibarra. The two proceeded to the bus stop and she did not see Swan interact further with Baxter. She and Ibarra were walking slowly and Swan walked past them at some point after they had reached Fillmore Street. Swan said something about forgetting his yogurt, but Wenzel did not remember that he turned back to get it.

Virruet saw Baxter approach Swan, Wenzel and Ibarra from a point at which Baxter was three or four feet away. Baxter "walked like, just more like a wobbly type of walk and loudly towards them and with his hands, you know, asking for change." He "just kept waving [his arms] like in a way of just walking towards them." Baxter approached Swan from behind and was about a foot behind him with his hand cupped. Swan turned around, with a shocked look, so they were face to face. Swan appeared to put his fists up in a defensive posture. He began to talk with Baxter, but Virruet could not hear what was said. It did not appear to Virruet that Baxter ever spoke directly to Wenzel. Wenzel and Ibarra kept on walking, slowly, in Virruet's direction.

Virruet testified that Swan and Baxter "seemed to get a little hostile." The exchange between Swan and Baxter lasted a couple of minutes. Virruet then saw Baxter

---

[5] Later in her testimony, Wenzel described Baxter's action by saying that he "lunged" towards her, but only after Swan's counsel had used that word. Wenzel said that she turned her face away and ducked when Baxter "lunged."

4

take a step backwards.  Baxter had nothing in his hands, which he held up at chest level, waving them back and forth.  Baxter made no motion towards Swan, but Swan "took his right hand and went up in the air and came down forwards towards [Baxter]."  (As Virruet said this, he made a motion with his right hand held in a fist roughly at his head level.)  Swan then began to walk fast toward Virruet, passing Wenzel and Ibarra, while Baxter backed away, holding his hand to his face.  Swan then went past Virruet, "walking by pretty fast, because he was like running, trying to rush out . . . ."[6]  As he went past, Swan was trying to close a silver-colored knife with a seven-to-nine inch blade.  Virruet said that Swan had a "shock type look" and appeared to be nervous and very upset.

Chris Allmond, riding a bicycle on the sidewalk, saw the last moments of the encounter between Swan and Baxter from about 25 to 30 feet away.  Just before Swan cut Baxter, "they seemed to be like standing up, slouching over a bit, about a foot from each other like they were talking.  And then they both raised up and [Swan] went across [Baxter's] face with his right hand."  Allmond heard no yelling or screaming.  He saw no physical or aggressive action by either party before Swan cut Baxter.  During the incident, Allmond believed he saw something drop to the ground that could have been a small brown bag.  Baxter came toward Allmond and passed him, stumbling.  Baxter appeared to Allmond as if he had been splashed with fruit punch.  Only when Allmond later saw Baxter again did he realize that he had seen blood.

According to Allmond, Swan turned around, didn't say a word, and walked along the sidewalk at a normal pace.  Allmond described Swan as about five feet eight inches tall and said that Baxter was significantly taller.[7]  As Swan walked away, he reached into his pocket and may have been putting something away.  Swan was walking with a man who had been at his side when he cut Baxter.  Allmond followed them on his bicycle.

---

[6] On cross examination, Virruet said that Swan was walking at a fast pace, but was not running.

[7] Dr. Mitchell Cohn, a physician who treated Baxter, testified that Baxter is five feet nine inches tall and weighed 140 pounds at the time.  Wenzel testified that Swan is only slightly taller than her height of five feet two and three-quarter inches.

5

After walking in front of Allmond with the other person, Swan turned around and said "I forgot my yogurt," and the two men walked past Allmond. After Allmond cashed a check, he saw Baxter sitting on the corner with the police. He spoke with the police and gave a description of Swan.

Baxter was taken to a hospital, where Dr. Cohn was one of those who treated him. Baxter had suffered a stab or slash wound to the left side of his face, starting at the edge of the lip line and extending back and down towards the neck. A facial artery had been lacerated and had to be tied off. Baxter's face was sewn back up and he was given blood and fluid. The wound was eight centimeters long and went through the cheek to the inside of Baxter's mouth. Baxter had a "significantly high" blood alcohol level of .36. A drug screening indicated that Baxter had cocaine, a benzodiazepine, and methamphetamine in his system. Cohn believed that Baxter would have bled to death, probably within minutes, if he had not been treated. He testified that Baxter had suffered a "very serious life-threatening wound."

The police identified Swan as a possible perpetrator from a surveillance video. At Swan's residence they found a silver knife, of a type that opens and closes, on Swan's bed. They also found a gray backpack with nunchucks inside. Swan was arrested.

The next day, Officer James Aherne met Wenzel and Ibarra. Ibarra refused to talk, but Wenzel said she had just heard about the incident and knew nothing else. After being shown an image from the surveillance video showing that she was with Swan, Wenzel said that Baxter was acting crazy, saying "white witch," and putting his hands over their heads as they were walking. Wenzel told Aherne that Baxter threatened to kick her in the head and to punch her. Swan told her to keep walking, but Swan stopped. Wenzel said that at some point, Swan walked quickly past her and Ibarra.

Sean Truesdell, a heroin addict who had been convicted of a number of theft crimes, was in custody in the San Francisco County Jail, in segregated housing for white supremacists, when Swan was arrested. Truesdell identified as a skinhead and was part of the white supremacist movement at that time. He had known Swan for about four or five years.

6

Truesdell testified that when Swan arrived in jail, he looked sad and said he had "a big case"—"a hate crime and attempted murder." Swan said he "cut a nigger's face off." He told Truesdell that he was with Wenzel and Ibarra, whom Truesdell also knew, and that the African-American man he cut was "acting a little weird, making some movements, . . . just kind of every day stuff in San Francisco." Swan said that his wife had just passed away, that he was "going through a lot," and that he "just really didn't think twice about it, he had a knife on him and he cut his face." According to Truesdell, Swan said he was proud of what he had done and felt that he was a political prisoner, a casualty of war.

Swan described the knife he had used to Truesdell, who identified a photograph of the knife seized in Swan's room as consistent with Swan's description. Swan told Truesdell that after the incident, Wenzel had tried to convince him to dispose of the knife, but Swan refused because the knife had sentimental value to him. Instead, Swan said he cleaned it with bleach and water to eliminate traces of DNA. While Swan was in custody, he "got a tattoo, a political tattoo, a 14/88 tattoo . . . on his knuckles."[8]

Truesdell and Swan were housed together in custody for about four months. During this period, Swan gave Truesdell a letter to take with him on his release. After he was released, he delivered the letter to Wenzel. He told Wenzel about the charges against Swan and told her to contact Swan's counsel.[9]

Truesdell stated that he was not in custody and faced no charges at the time of Swan's trial. He testified that he had not been offered any money, leniency or other benefit for his testimony and that he was testifying because he wanted to change his life and didn't like the person he had become. Truesdell had cooperated with the police in several investigations and he had hoped for favorable treatment in a case pending at the

---

[8] Truesdell testified that the numbers "14" and "88" refer to the white supremacist "14 words" and "88 precepts." The parties stipulated that Swan does have such tattoos on his right hand.

[9] Wenzel testified that months after Swan cut Baxter, Truesdell approached her and said that Swan wanted to "get ahold of [her]" and wanted her to contact his attorney. However, Wenzel denied that Truesdell gave her a letter written by Swan.

time he began cooperating, though he never received any leniency. He worked with the police until he was again arrested because he couldn't "stay clean" and was involved in a burglary. He was currently in protective custody and was provided a room and $400 per month for food. He expected nothing from his testimony at Swan's trial.

San Francisco police officer Alberto Miranda testified that on October 24, 2008, he arrested Swan for malicious mischief and graffiti after observing him coloring in the outline of a swastika on a wall. Near the swastika were the words "WHITE POWER" and the numbers "14" and "88." In a sheath worn on his belt, Swan had a knife that was about 11 inches in total length. The officer seized the knife but did not take Swan into custody. The case against Swan was later dismissed.

The defense presented testimony by five police officers concerning prior behavior by Baxter, including public intoxication, yelling and cursing, waving of the arms, and other behavior annoying to the public, such as blocking the paths of people as he panhandled. While intoxicated, Baxter had twice threatened officers. On two occasions, when placed in a police car, Baxter had spit and kicked at windows or doors. However, none of the officers had seen Baxter being physically aggressive toward another person.

The defense also presented the testimony of Kayed Ayesh, who stated that Truesdell had stolen cupcakes from the market owned by his father. Ayesh's mother tried to stop Truesdell, but he pushed her and ran from the store. Ayesh gave chase, but when he caught up to Truesdell, Truesdell pointed a knife at him and asked if he wanted to die that night.

## DISCUSSION

We observe at the outset that Swan's argument for self-defense or defense of others (Wenzel) is exceedingly weak. Even if the jury believed Wenzel's testimony that Baxter threatened her and lunged at her, no witness placed Wenzel within Baxter's reach when Swan cut him. Indeed, both Wenzel and Virruet testified that she walked away from Swan and Baxter, who, according to Virruet, interacted for a minute or two.

8

Allmond saw only an unidentified man near Swan (whom he thought was accompanying Swan), not Wenzel.[10]

Baxter may have made threats to Swan similar to the threats he made to Wenzel, though no one testified that he did, but no one saw Baxter make an aggressive movement toward Swan. No one saw Baxter with a weapon, and if Swan feared an attack from Baxter, nothing suggests that it would have been with more than fists. We do not believe that any jury, rationally evaluating this evidence, could come to a conclusion other than that Swan, in attacking Baxter with a deadly weapon, used far more force than was reasonable and necessary under the circumstances.

Swan himself concedes in his reply brief that he used more force than was reasonable and necessary: "It is true that in retrospect making contact with Baxter's face with a cutting weapon was probably unwarranted and constituted more force than was reasonable under the circumstances. The issue, however, was [Swan's] state of mind at the time." Swan fails to understand the law of self-defense or defense of others. True, Swan's state of mind is at issue, because Swan must actually fear imminent physical harm. But if Swan had such a fear, he must use no more force than a reasonable person would find to be necessary under the circumstances—and that has nothing to do with Swan's state of mind. (See CALCRIM No. 3470.)

## I. *Evidence Of White Supremacist Beliefs*

Swan contends that the trial court erred by admitting evidence that Swan is a white supremacist—testimony that Swan had been cited for writing racist graffiti on a prior occasion and Truesdell's testimony "that [Swan] was a white supremacist and had had racist tattoos placed on his knuckles while in jail." The account of the graffiti incident included testimony that Swan possessed a knife on that occasion, and Swan contends that this presented "additional prejudice."

Swan's primary argument on appeal is the contention that evidence of Swan's white supremacist beliefs was irrelevant and constituted inadmissible character evidence

---

[10] Allmond testified that he saw no woman with Swan when he cut Baxter.

9

under Evidence Code section 1101, subdivision (a).[11] In addition, he argues that even if "remotely relevant," the probative value of the evidence "is so attenuated so as to be substantially outweighed by its prejudicial effect" and should have been excluded under Evidence Code section 352.[12] We consider separately Truesdell's testimony about what Swan said, Truesdell's testimony about Swan's jailhouse tattoo, and evidence concerning the swastika graffiti, evaluating as to each whether the evidence was relevant, was inadmissible character evidence, or should have been excluded under Evidence Code section 352.

## A. *Truesdell's Testimony About Swan's Statements*

We have carefully examined Truesdell's testimony. Although Truesdell identified himself as a former skinhead and white supremacist, at no time did he so identify Swan. Truesdell simply related what Swan told him and it was Swan's own statements (that he had "cut a nigger's face off" without "think[ing] twice about it," was proud of what he had done, and regarded himself to be a political prisoner) that raised the strong implication that he subscribed to white supremacist beliefs. Swan's statements to

---

[11] Evidence Code section 1101, subdivision (a) provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." However, Evidence Code section 1101, subdivision (b) provides: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

[12] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

10

Truesdell were hearsay, but were admissible as party admissions under Evidence Code section 1220,[13] if they were relevant and not otherwise barred.

By arguing that he had acted in self-defense or defense of others, Swan put his motivation for cutting Baxter in issue. The jury had to determine whether Swan's motivation was fear of imminent physical harm or something else. The prosecution legitimately offered another motivation for the jury's consideration. Swan's argument that what he said to Truesdell was not relevant is frivolous. It is hard to imagine evidence more probative of Swan's motive than his own characterization of his act as "cut[ting] a nigger's face off" without "think[ing] twice about it" and statements that he was proud of what he had done and regarded himself as a political prisoner and casualty of war.

A defendant's statements could come within the hearsay exception of section 1220 but still be inadmissible under Evidence Code section 1101, subdivision (a).[14] For example, the defendant may have commented on his own character or reputation or may have told of an instance of his conduct unrelated to the crime charged. Such is not the case here, where Swan's statements were not about unrelated acts but rather about the very act that comprised the charged crime. And in any event, the statements were admissible under subdivision (b) because they were highly probative of Swan's motive. The fact that evidence casts a defendant in a bad light does not alone render it

---

[13] Evidence Code section 1220 provides: "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ."

[14] Swan moved in limine to exclude testimony by Truesdell, arguing that it should be precluded as a discovery violation, that it was uncorroborated under section 1111.5, and that it was unduly prejudicial under Evidence Code section 352. In a subsequent hearing, Swan objected to Truesdell's testimony as uncorroborated, irrelevant, unduly prejudicial and a violation of his constitutionally protected status as a skinhead. Had the People made the argument, we might conclude that Swan had failed to preserve for appeal the issue of whether Truesdell's testimony was inadmissible character evidence. (*People v. Tom* (2014) 59 Cal.4th 1210, 1238 ["As a general rule, a timely and specific objection at trial to the admission of evidence is a necessary prerequisite before one may challenge on appeal the admissibility of the evidence."]; see Evid. Code, § 353.) However, because the parties have not addressed whether Swan had waived the character evidence argument with respect to Truesdell's testimony, we do not rule on that basis.

inadmissible character evidence. If that were the case, all prosecution evidence showing a defendant committed the charged crime would be inadmissible, which obviously is not the law.

Evidence Code section 352 gives the trial court discretion to exclude evidence if its probative value is "substantially outweighed" by the probability that it will "create substantial danger of undue prejudice." It is unquestionable that in contemporary society, evidence that a person subscribes to white supremacist beliefs will expose him or her to opprobrium. Where evidence of white supremacist beliefs has little probative value, it could be unduly prejudicial. (Cf. *People v. Williams* (1997) 16 Cal.4th 153, 193 ["even where gang membership is relevant, because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it"].) However, " ' "[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.) "Evidence is not unduly prejudicial 'merely because it strongly implicates a defendant and casts him or her in a bad light.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 50.) Rather, "[e]vidence is prejudicial within the meaning of Evidence Code section 352 if it encourages the jury to prejudge defendant's case *based upon extraneous or irrelevant considerations*." (*People v. Rogers* (2006) 39 Cal. 4th 826, 863 [italics added].) Here, the evidence of Swan's motive has high probative value: Swan's white supremacist beliefs provide a motive for his act of violence against the African-American victim in this case, and his own statements directly connect those beliefs with this crime. The trial court did not abuse its discretion by declining to exclude this evidence under Evidence Code section 352.

## B. *The 14/88 Tattoo*

At an Evidence Code section 402 hearing on Truesdell's testimony, Truesdell stated that Swan's jailhouse tattooing of 14 and 88 on his knuckles was a rite of passage to which Swan was now entitled because he had "put in some work as we would call it." Thus, the tattooing was directly connected to Swan's cutting of Baxter.

Evidence of the tattooing is circumstantial evidence that Truesdell was motivated by racial animus when he cut Baxter—and thus was relevant evidence. It was an action Swan took as a consequence of cutting Baxter and tended to confirm Swan's statement to Truesdell that he was proud of what he had done. Of course, Swan could have been motivated by fear of imminent physical harm when he cut Baxter and simply used the incident to enhance his reputation among white supremacists,[15] but the nature of circumstantial evidence is that it tends to support one side of a factual dispute while not necessarily being wholly inconsistent with the other side.

The tattooing was a specific instance of Swan's conduct and was evidence that Swan was a white supremacist. Evidence that one is a white supremacist is somewhat analogous to evidence of gang affiliation[16] and "[i]n general, '[t]he People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." ' " (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 655.) Swan's tattooing was admissible under Evidence Code section 1101, subdivision (b) because it was relevant to the issue of motive.

We have already noted that evidence of motive generally has probative value exceeding its prejudicial value. Particularly given defendant's statements to Truesdell about the crime, the evidence that Swan received the racist tattoos in jail was not unduly prejudicial. The trial court did not abuse its discretion in admitting that evidence.

---

[15] Truesdell agreed that "there is a little bit of bravado that goes on when you come in to custody about what happened."

[16] See *People v. Lindberg*, *supra*, 45 Cal.4th at p. 46 [analogizing evidence concerning white supremacy to evidence of gang activity]. Racist attitudes regrettably remain endemic in our society, and the average juror likely knows that not all people who have racist attitudes act on them in violent and criminal ways. Thus, while white supremacy probably draws equal if not greater social opprobrium than gang membership, the stronger association between gang membership and criminal conduct may lead more easily to an improper conclusion that the gang member acted in conformity with his or her membership by committing the charged crime.

## C. *The Graffiti Incident*

Swan and the prosecution filed cross motions in limine seeking, respectively, to exclude and admit evidence of the graffiti incident in which Swan was arrested while coloring in the outline of a swastika on a wall near the words "WHITE POWER" and the numbers "14" and "88." Swan argued that the evidence would be evidence of character, inadmissible under section 1101, subdivision (a). The trial court granted the prosecution's motion, ruling that the evidence was admissible pursuant to Evidence Code section 1101, subdivision (b) "[b]ecause it is clear, circumstantial and direct evidence regarding motive, mindset to act more aggressively against blacks. It negates a reasonable belief in using—the need to use deadly force . . . against an unarmed apparent panhandler."

We do not reach the question whether the court abused its discretion (*People v. Rogers*, *supra*, 39 Cal.4th at p. 862) by admitting evidence of the graffiti incident because if the court erred, the error was harmless. The fact that Swan had previously been seen drawing white supremacist graffiti was merely cumulative to Truesdell's far more damaging—and far more material—testimony concerning Swan's statements and actions reflecting his white supremacist motive for committing the offense. As already discussed, that testimony was properly admitted into evidence. The jury already knew from the latter testimony about defendant's racist beliefs. Moreover, there was no need and therefore little risk that the jury would make the quantum leap from the graffiti incident to the defendant's motive for the assault, because both defendant's statements to Truesdell about the assault and the tattoos defendant obtained provided a direct link between his racist beliefs and his assault of Baxter.[17] That Swan possessed a knife during

---

[17] It is true that evidence concerning the graffiti may have enhanced Truesdell's credibility in the jury's estimation, but Truesdell's credibility was amply enhanced by other corroborative evidence, including Virruet and Allmond's eyewitness identifications of Swan; the numbers "14" and "88" tattooed on Swan's knuckles; the knife found in Swan's room, which was consistent with the knife Swan described to Truesdell; Wenzel's testimony that Swan's wife had recently died; and Wenzel's testimony that she

14

the graffiti incident (with no evidence that the possession was illegal or that Swan had ever used the knife) was irrelevant to the proceedings here, but could not have prejudiced Swan because it was uncontested that he had cut Baxter's face with a knife.

## D. *First Amendment Argument*

Swan makes a half-hearted two-sentence First Amendment argument challenging the evidence that he was a white supremacist: "In addition, the use of such evidence as [Evidence Code section] 1101[, subdivision] (b) prior acts, impinges upon First Amendment considerations. . . . [E]vidence of generalized affiliations with disfavored groups such as gangs or extremist parties should be inadmissible unless directly relevant to specific issues in the case such as bias or the credibility of a witness." Having failed to provide significant argument on the point, defendant has waived this argument.[18] (Eisenberg et al., Cal. Practice Guide, Civil Appeals and Writs (The Rutter Group 2014) ¶ 9:21, p.9-6 [appellate court has discretion to disregard issues not properly addressed in briefs].)

Even if he had not waived it, the argument lacks merit. Here, the evidence we have found admissible is Truesdell's testimony concerning Swan's statements and the jailhouse tattooing. That evidence was highly probative of defendant's motive, which became an issue because of Swan's assertion of self-defense or defense of others. This was not evidence of a generalized affiliation with a disfavored group, but evidence of what Swan said about the charged incident and actions he took as a direct consequence of the charged incident. Swan cites no case, and we are aware of none, holding that the First Amendment bars the use of evidence of a defendant's exercise of his rights of free speech and association when such evidence is relevant to an issue before the court. Indeed, in two cases defendant does not mention or discuss, our Supreme Court has held the

---

met with Truesdell after he was released and confirmed that Truesdell said she should contact Swan's attorney. (See section 1111.5.)

[18] In his reply brief, Swan faults the People for "mak[ing] no mention of the First Amendment issue presented by this case." The People can hardly be faulted for ignoring the two sentences buried, without so much as a separate heading, on the ninth page of appellant's ten-page discussion of the claimed evidentiary errors.

opposite. (*People v. Merriman* (2014) 60 Cal.4th 1, 104-105 [evidence proving "more than defendant's association and abstract beliefs" that is relevant to issues raised by the case not barred by First Amendment]; *People v. Smith* (2003) 30 Cal.4th 581, 626 ["racial epithets from a defendant's own mouth are admissible to show the facts surrounding the crimes" and their admission does not violate defendant's free speech rights]. The cases Swan does cite concern evidence that is *not* relevant, differentiating them from this case. (See *Dawson v. Delaware* (1992) 503 U.S. 159, 165 [finding constitutional error in introduction of evidence that defendant was a member of the Aryan Brotherhood because it was "totally without relevance to Dawson's sentencing proceeding"]; *Wainwright v. Lockhart* (8th Cir. 1996) 80 F.3d 1226, 1234 [evidence of gang membership cannot be raised at sentencing when not relevant to the rebuttal of any specific mitigating evidence].)

## II. *Alleged Instructional Errors*

Swan contends that the court committed five errors in instructing the jury. Where we find merit in Swan's arguments, we conclude that the error was harmless.

## A. *CALJIC No. 5.31*

As the court discussed instructions (derived from CALCRIM) to be given to the jury with the parties, it suggested that instruction with CALJIC No. 5.31[19] might be warranted. Defense counsel objected on the grounds that mixing CALJIC instructions with CALCRIM instructions is improper and that the instruction would confuse the jury.

In addition to CALJIC No. 5.31, the court instructed the jury concerning self-defense and defense of others with CALCRIM No. 3470,[20] CALCRIM No. 917,[21] and CALCRIM No. 3472.[22]

---

[19] CALJIC No. 5.31 provides: "An assault with the fists does not justify the person being assaulted in using a deadly weapon in self-defense unless that person believes and a reasonable person in the same or similar circumstances would believe that the assault is likely to inflict great bodily injury upon [him] [her]." CALCRIM does not provide an analogous instruction.

[20] CALCRIM No. 3470, as delivered to the jury, provides, in relevant part: "Belief in future harm is not sufficient, no matter how great or how likely the harm is

16

The prefatory CALCRIM instruction guide states: "The CALJIC and CALCRIM instructions should never be used together. While the legal principles are obviously the same, the organization of concepts is approached differently. Mixing the two sets of instructions into a unified whole cannot be done and may result in omissions or confusion that could severely compromise clarity and accuracy."

We fully support CALCRIM's guidance that CALCRIM and CALJIC instructions should not be mixed. However, whatever the wisdom of mixing instructions from the two sources, "[t]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 750-754.) "The fact that the commission ultimately drafted the newer CALCRIM instructions, which the Judicial Council subsequently adopted (Cal. Rules of Court, rule 2.1050(e)), does not establish that the prior CALJIC instructions were constitutionally defective. 'Nor did their wording become inadequate to inform the jury of the relevant legal principles or too confusing to be understood by jurors. The Judicial Council's adoption of the CALCRIM instructions simply meant they are now endorsed and viewed as superior.' " (*People v. Lucas* (2014) 60 Cal.4th 153, 294.) "No statute, rule of court, or case mandates the use of

---

believed to be. The defendant must have believed there was imminent danger of bodily injury to himself or someone else. Defendant's belief must have been reasonable. And he must have acted only because of that belief. [¶] The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense or defense of another."

[21] As adapted by the court, CALCRIM No. 917 provides: "Words, no matter how offensive, and acts that are not threatening, are not enough to justify an assault or battery. However, if you conclude that Ernest Baxter spoke or acted in a way that threatened Matthew Swan with immediate harm or others, you may consider that evidence in deciding whether the defendant acted in self-defense or in defense of someone else."

[22] CALCRIM No. 3472 provides: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

CALCRIM instructions to the exclusion of other valid instructions." (*People v. Thomas* (2007) 150 Cal.App.4th 461, 465-466.)

Swan cites *People v. Freeman* (1994) 8 Cal.4th 450, 503-504 and *People v. Yoshimura* (1979) 91 Cal.App.3d 609, 632 for the proposition that trial courts are advised against giving " 'impromptu instructions' " and engaging in " 'trial court experimentation.' " Both of these cases addressed variance from CALJIC No. 2.90, the instruction on reasonable doubt, and neither found prejudicial error from the modification. Neither case stands for the proposition that mixing CALCRIM and CALJIC instructions constitutes per se error. Swan also cites *People v. Solorzano* (2007) 153 Cal.App.4th 1026, 1038, which is of no assistance to him. *Solorzano* merely rejected the contention that the CALJIC instruction on prior inconsistent statements is superior to the analogous CALCRIM instruction and noted that CALJIC instructions would not "serve as the benchmark by which to adjudicate the correctness of CALCRIM instructions." (*Ibid.*)

CALJIC No. 5.31 is a correct statement of the law. (*People v. Rush* (1960) 180 Cal.App.2d 885, 889-890 [a " 'probable danger of less degree than great bodily injury' " is insufficient to justify the exercise of the right of self-defense].) We have searched in vain for a case in which a court has been found to have erred by instructing the jury with CALJIC No. 5.31.

Aside from the commingling of CALCRIM and CALJIC instructions, Swan contends that "[n]o evidence whatsoever was adduced that Baxter started or was engaged in any physical violence by the use of his fists from which the defendant believed he needed to defend himself. [Swan's] self defense theory was that Baxter had waved his arms in the direction of Helen Wenzel and, according to her testimony, threatened to inflict serious bodily injury, from which defense counsel argued that Baxter may have similarly threatened [Swan]. [Citation.] Hence, suggesting to the jury that the only threat posed by Baxter were his fists may well have [misled] them from considering the other self defense instructions that [Swan] was entitled to use force if he reasonably believed it was necessary to defend himself or others." We differ with Swan's view of the evidence,

18

which here showed at most that Baxter, whom no one saw with a weapon, waved his arms about, made verbal threats, and lunged at Wenzel, whom no witness placed within Baxter's reach at the time Swan cut his face. The evidence amply supports a conclusion that Swan could have feared no more than fisticuffs on Baxter's part.

Swan also contends that "the jury may have been led to believe that the trial court had concluded that the only threat they were to consider Baxter posed was with his fists." CALJIC No. 5.31 does not take the form of a factual conclusion and the jury was instructed: "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume that just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." "We presume the jury followed the trial court's instructions" (*People v. Adams* (2014) 60 Cal.4th 541, 578), and nothing in the record contradicts that presumption.

Swan finally contends that "the trial court's experimentation with CALJIC 5.31 was functionally equivalent to a prosecution pinpoint instruction. As such, it must be therefore be [*sic*] held improperly argumentative as well. 'There should be absolute impartiality as between the People and the defendant in the matter of instructions . . . .' [Citations.] Here by focusing on one argument that the prosecution wished emphasized, the trial court appeared to have aligned itself with the prosecution's theory of the case to the detriment of the defense." In support of this contention, Swan cites *People v. Moore* (1954) 43 Cal.2d 517, 526-527, but that was a case in which the disputed instructions were not neutral statements of the law, but focused on the defendant by name and were phrased from the point of view of the prosecution. Moreover, the trial court in *Moore* had failed to give instructions requested by the defense that were also legally correct and supported by the evidence. (*Id.* at pp. 527-529.) Here, we have no reason to believe that the court acted improperly in giving an instruction that is a neutral statement, legally correct, supported by the evidence presented to the jury and for which no analogous CALCRIM instruction exists.

19

## B. *CALCRIM No. 3472*

The trial court instructed the jury with CALCRIM No. 3472: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." Swan contends that it was error for the court to give this instruction because there was no evidence supporting a conclusion by the jury that Swan had provoked a fight or quarrel with Baxter to create an excuse to use force. We agree.

The evidence here is strong that Baxter, not Swan, provoked the encounter between them. However, if a fact finder found the evidence of Baxter's threats, erratic actions and lunging not to be credible, all that is left is Virruet's evidence that Swan raised his fists after Baxter surprised him from behind and that the two argued for a minute or two before Swan cut Baxter's face. It is possible that a jury could conclude that Swan provoked a quarrel with Baxter. There was, however, no evidence that would justify a conclusion that Swan provoked the quarrel with the intent of creating an excuse to use force.

Even though instruction with CALCRIM No. 3472 was not warranted by the evidence, this "does not warrant our finding reversible error because the jury is presumed to disregard an instruction if the jury finds the evidence does not support its application." (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 278.) This is especially true where, as here, the court specifically instructed the jury that some of the instructions given "may not apply." We have no reason to believe that the jury was unable or unwilling to disregard CALCRIM No. 3472 if it did not apply to the facts as the jury found them.

## C. *CALCRIM No. 336*

Section 1127a, subdivision (b), provides: "In any criminal trial or proceeding in which an in-custody informant testifies as a witness, upon the request of a party, the court shall instruct the jury as follows: [¶] 'The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may

20

arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case.' "

Section 1111.5, subdivision (a), provides: "A jury or judge may not convict a defendant . . . based on the uncorroborated testimony of an in-custody informant. The testimony of an in-custody informant shall be corroborated by other evidence that connects the defendant with the commission of the offense . . . to which the in-custody informant testifies. Corroboration is not sufficient if it merely shows the commission of the offense . . . . Corroboration of an in-custody informant shall not be provided by the testimony of another in-custody informant unless the party calling the in-custody informant as a witness establishes by a preponderance of the evidence that the in-custody informant has not communicated with another in-custody informant on the subject of the testimony."

Section 1111.5 became effective on January 1, 2012, before Swan's trial. (Stats. 2011, ch. 153, § 1.) However, the instruction concerning in-custody informants, CALCRIM No. 336, was not updated to include the requirements of section 1111.5 until August 2012.

Prior to August 2012, at the time of Swan's trial, CALCRIM No. 336 read, in relevant part: "The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case." The trial court's instructions to the jury included this version of CALCRIM No. 336 (adapted slightly by identifying Truesdell as the in-custody informant).

The August 2012 Supplement to CALCRIM updated CALCRIM No. 336 to read, in relevant part: "View the (statement/ [or] testimony) of an in-custody informant against the defendant with caution and close scrutiny. In evaluating such (a statement/ [or] testimony), you should consider the extent to which it may have been influenced by the

21

receipt of, or expectation of, any benefits.  This does not mean that you may arbitrarily disregard such (a statement/ [or] testimony), but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case.  [¶] . . . [¶]  You may use the (statement/ [or] testimony) of an in-custody informant only if:  [¶]  1. The (statement/ [or] testimony) is supported by other evidence that you believe;  [¶]  2. That supporting evidence is independent of the (statement/ [or] testimony); [¶] AND  [¶]  3. That supporting evidence connects the defendant to the commission of the crime[s] [or to the special circumstance/ [or] to evidence in aggravation]. The supporting evidence is not sufficient if it merely shows that the charged crime was committed [or proves the existence of a special circumstance/ [or] evidence in aggravation].  [¶]  [*Supporting evidence*, however, may be slight.  It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact (mentioned by the accomplice in the statement/ [or] about which the witness testified). On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission.  The supporting evidence must tend to connect the defendant to the commission of the crime.]"

Swan contends here:  "Inexplicably . . . the court only read the jury the first paragraph of CALCRIM [No.] 336, which cautions the jury to weight [*sic*] carefully the testimony of [an in-custody informant].  The trial court omitted critical language that follows that requires that the jury not 'use the statement' of such a witness in any manner unless it is corroborated.  This omission constituted prejudicial error."  (Fn. omitted.) Swan goes on to claim that no evidence "was lawfully presented" that corroborated Truesdell's testimony that Swan made statements demonstrating that he was motivated by racial animus.

Because the revised instruction was not published until *after* Swan's trial, it is not at all "[i]nexplicabl[e]" that the court failed to instruct the jury with the new part of CALCRIM No. 336.  In fact, Swan's trial counsel recognized that CALCRIM No. 336 did not contain the new requirements of section 1111.5 and proposed instructional language that the court rejected.  The People agree with Swan that the trial court erred by

not giving some instruction concerning the corroboration required by section 1111.5. We also agree. However, "we may reverse the judgment only if we are able to say it is reasonably probable the jury would have reached a result more favorable to defendant if the trial court had instructed that before the jury could convict defendant based solely on the testimony of [the] in-custody informant, there must be evidence that corroborates that testimony, i.e., that connects defendant to the commission of the crime." (*People v. Davis* (2013) 217 Cal.App.4th 1484, 1490.)

As the current version of CALCRIM No. 336 provides, the required supporting evidence may be "slight" and need not support every fact contained in Swan's statements to which Truesdell testified. The supporting evidence is required only "to connect the defendant to the commission of the crime." Virruet and Allmond's identifications of Swan as the person who cut Baxter connect Swan to the commission of the crime.[23] Even were separate corroboration of Swan's racial motivation required, that was provided by the tattooing of "14" and "88" on Swan's knuckles.

Moreover, as we have already commented, we find little likelihood that a jury, rationally evaluating the evidence that was independent of Truesdell's testimony, could find Swan's cutting of Baxter's face to be a reasonable response to any threat posed by Baxter. Because it is uncontestable that Truesdell's testimony was corroborated and because there was more than enough other evidence to convict Swan, we do not find a reasonable probability that the jury would have reached a more favorable result for Swan had it been properly instructed.

## D. *CALCRIM No. 372*

The trial court instructed the jury with CALCRIM No. 372: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning

---

[23] Swan cites *People v. Davis*, *supra*, 217 Cal.App.4th 1484, for the proposition that "*each* fact which 'connects' a defendant to the crime charged testified to by [an in-custody informant] needs to be corroborated." (Italics added.) Not only does this proposition contradict current CALCRIM No. 336, we find no support for it in *Davis*.

23

and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." Swan argues: "Because the evidence does not reveal that [Swan] was clearly aware of all the facts pertaining to [the] injury suffered by Baxter and thus his commensurate potential culpability as a result of his actions, the giving of this instruction was error. In addition, his act of walking away from the scene did not constitute flight."

"An instruction on flight is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt, and flight requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." (*People v. Crandell* (1988) 46 Cal.3d 833, 869, overruled on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) Here there was substantial evidence that Swan fled from the scene after he cut Baxter.

Virruet testified that immediately after the encounter with Baxter, Swan walked past him at a fast pace while attempting to close the knife. Moreover, according to Virruet, he did not stop to help Wenzel with Ibarra, as he had been doing before the encounter with Baxter, but passed them and left the plaza. Although this evidence was disputed (Allmond did not see Swan hurrying away from the scene, Wenzel denied that Swan passed her and Ibarra in the plaza, and Swan may have returned to the plaza to retrieve a bag containing yogurt he had dropped), a rational jury could conclude from the evidence that Swan had indeed fled from the scene in order to avoid being apprehended. It may well be that Swan was not aware of the seriousness of the injury he had inflicted on Baxter, but the jury could easily conclude that Swan was aware that he had inflicted some injury. Swan cites no authority for the proposition that a flight instruction requires a defendant to understand the seriousness of his or her crime—all that is required is that the defendant understand that he or she has committed *some* crime, so that the jury can reasonably infer consciousness of guilt if it determines that the defendant fled to avoid apprehension.

The trial court did not err in instructing the jury with CALCRIM No. 372.

24

## E. *CALCRIM No. 371*

Based on "<Alternative A—suppression>" of CALCRIM No. 371, the trial court instructed the jury: "If the defendant tried to hide evidence by cleaning the knife with bleach, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

Swan argues that the court erred in so instructing the jury because there was no evidence that Swan had cleaned the knife with bleach besides "the testimony of an uncorroborated in custody informant" and because such cleaning of the knife "was not supported by the remainder of the evidence."

We have already rejected Swan's contention that every detail of Truesdell's testimony requires corroboration. Truesdell's testimony was sufficiently corroborated in other particulars, and that testimony included Swan's statement that he had cleaned the knife with bleach to remove traces of DNA.

Swan contends that Truesdell's testimony concerning Swan's cleaning of the knife was contradicted by Kimberly Sylvester, a criminalist in the DNA unit of the San Francisco Police Department Criminalistics Laboratory. Sylvester testified that she had examined swabs taken from the knife that was seized from Swan's apartment. Sylvester obtained a DNA profile from a swab from the knife handle and another profile from a swab from the knife blade. The handle profile was consistent with the blade profile and Baxter could be excluded as a contributor to either profile. Sylvester also testified that cleaning with bleach can eliminate traces of DNA. Sylvester's testimony does not contradict Swan's statement to Truesdell that he cleaned the knife with bleach. Sylvester did not testify to having compared the DNA profiles she obtained with Swan's profile, leaving open the possibility that the DNA she detected was from Swan's handling of the knife after he had cleaned it with bleach.

Swan's argument fails and we find no error.

**III.** *Swan Was Not Deprived Of Effective Assistance Of Counsel.*

Swan contends that his trial counsel provided him ineffective assistance because counsel failed to move for severance of count 3, possession of nunchucks. We disagree.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

"When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.] Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "If 'counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' " (*People v. Diaz* (1992) 3 Cal.4th 495, 557.)

Before trial, defense counsel first moved to dismiss count 3 pursuant to section 995, arguing that there was insufficient evidence to tie Swan to possession of the nunchucks at the crime scene and that he had a constitutional right under the Second Amendment to possess the nunchucks. The court denied the motion.

Defense counsel subsequently moved in limine to dismiss count 3 as a violation of Swan's right to bear arms under the Second Amendment, repeating the arguments made in the earlier motion to dismiss under section 995. Again, the court denied the motion.

After the prosecution rested, defense counsel moved for acquittal on count 3 pursuant to section 1118.1, arguing, without success, that there was no evidence that Swan had possessed nunchucks as a weapon. Again, the court denied the motion.

Defense counsel argued in closing that the prosecutor had failed to prove that Swan knew that what he possessed were nunchucks that were prohibited by law, "[a]nd more importantly, there is no evidence that he ever used any nunchucks during the incident that occurred in the square."

The record before us does not reveal why defense counsel did not seek to sever count 3, but it does demonstrate that counsel went to great lengths to dismiss the count, and then argued for acquittal rather than attempting to have the count tried separately—an ultimately successful tactic, given that the jury acquitted Swan on count 3.

Failing to move for severance might have been an unreasonable tactic only if evidence of possession of nunchucks were significantly prejudicial as to count 1. Swan maintains that it was: "significant prejudice accrued to [Swan] from his being charged with possessing an illegal deadly weapon especially in light of the fact that evidence had been introduced that he had possessed other deadly weapons as well." Here, where it was uncontested that Swan cut Baxter with a knife, possession of nunchucks, with no evidence that Swan had ever used them, could have had little if any prejudicial effect. Again, we have no doubt that the jury found Swan guilty on count 1 because, if he actually feared an attack from Baxter, his use of force was unreasonable, not because the jury believed him to be a violent person because he possessed a different weapon than the knife used in the attack.

Swan also argues: "[D]espite the fact that there was no question that the alleged nunchuks were in fact nunchuks and found in an apartment occupied exclusively by [Swan], he was acquitted of that count. Such a verdict raises the strong inference that the jury compromised its verdict. [Citation.] Such a compromise may demonstrate a reasonable probability existed that counsel's omission in not seeking a severance of that count was prejudicial to [Swan] with regard to the assault charge of which [Swan] was convicted. [Citation.]" As we have noted, counsel vigorously sought to have count 3

27

dismissed and argued for acquittal in his closing. During deliberation, the jury queried whether it was required that Swan knew that what he possessed was nunchucks. The court replied in the affirmative. This strongly suggests that the jury acquitted Swan on count 3 because there was no evidence that Swan understood the nature of the object he possessed, not because of a compromise that may cast doubt on the jury's conclusion that Swan had not acted in self-defense.

Swan has failed to demonstrate either that failure to move for severance was not a reasonable tactical choice by defense counsel or that such choice resulted in prejudice. Accordingly, we reject his claim of ineffective assistance.

## IV. *Cumulative Error*

Swan argues that if individual errors in this case were not sufficiently prejudicial to require reversal, then the cumulative prejudice presented by the errors requires reversal. We disagree. On the record before us, the errors that occurred were harmless, both individually and considered together.

### DISPOSITION

The judgment of the trial court is affirmed.


_____

STEWART, J.


We concur.


_____

KLINE, P.J.


_____

RICHMAN, J.


28