Filed 8/14/25  P. v. Peraza-Caamal CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ADRIAN FENELY PERAZA-CAAMAL,<br><br>        Defendant and Appellant. | A168718<br><br>(Marin County<br>Super. Ct. No. SC211587A) |

A jury convicted Adrian Fenely Peraza-Caamal on two counts of continuous sexual abuse of a child (Pen. Code,[1] § 288.5, subd. (a)) and found that his crimes had multiple victims (§ 667.61, subd. (e)(4)), namely, his stepdaughters Jane Doe 1 and Jane Doe 2 (who were identified by those pseudonyms at trial).  The court sentenced him to 50 years to life in prison. He contends that it erred in two ways.  First, it let the prosecutor, in posing hypothetical questions to an expert on child sexual abuse accommodation syndrome (CSAAS), call the hypothetical victims "Jane Doe 1" and "Jane Doe 2," i.e., the same pseudonyms used for the actual victims.  This assertedly enabled the expert to implicitly affirm the truth of their allegations.  Second, the court gave CALCRIM No. 1193, which told the jury how to use CSAAS testimony to evaluate the victims' credibility and which, in Peraza- Caamal's

---

[1]  All undesignated statutory citations are to the Penal Code.

view, improperly allowed the jury to treat such testimony as proof that the victims did in fact suffer sexual abuse.  We disagree on each point and affirm.

## BACKGROUND

In 2009, Peraza-Caamal moved in with Maria E., whose daughters Jane Doe 1 (JD1) and Jane Doe 2 (JD2) were about 7 and 3 years old. Peraza- Caamal and Maria E. later had two daughters.  JD1's relationship with Maria E. "was never good."  In 2009, she met Beth Bartl via the Big Brother/Big Sister program and became close to her, as JD2 later did.

When JD1 was in second grade, Peraza-Caamal began sexually abusing her, first by digital penetration and forced oral copulation, then by vaginal and anal rape.  To facilitate the abuse, he often took her at night to a building where he worked as a janitor.

In 2011, Peraza-Caamal told Bartl that JD1 had accused him of sexual abuse, but "the authorities had been informed and it had been resolved as not true."  Peraza-Caamal told JD1 not to report the abuse; he said he was friendly with police officers he knew from a local deli and with school personnel, and that people would see him as a good father and provider, and thus not believe her.  He also told JD1 not to tell her mother, but she did so at least twice.  One of those times, Maria E. slapped her and insinuated she "started everything," which made her regret her disclosure.  In any case, she testified, Peraza-Caamal "would always talk [Maria E.] out of" believing her.

Peraza-Caamal perpetuated the abuse by isolating JD1 and forbidding her to talk to boys or "girls who talked to boys," or to eat lunch with friends at school.  To enforce the latter restriction, he falsely told staff that she would not eat or would purge her food unless he supervised her, and he brought her lunch each day and made her eat in his car. If JD1 resisted sexual acts, he coerced her by slapping or covering her face or threatening to harm her dog,

2

which was especially effective as she "couldn't have friends," so her dog was "the only thing [she] had."

In 2015, when JD1 was in seventh grade, Peraza-Caamal suspected he had impregnated her, had her take pregnancy tests that confirmed it, and then had her go to Planned Parenthood, where she "peed in a cup [and] filled out the papers" but then left. Peraza-Caamal set about inducing a miscarriage by pressing on JD1's stomach as she lay on the floor, making her drink lemon or lime juice, and finally calling his mother, who sent him a vaccine with which he injected JD1 as he used to do with the "cows back home." JD1 miscarried.

In 2017, when JD1 was 14, Peraza-Caamal and Maria E. separated. On a night in July 2017, Peraza-Caamal came to the house when only JD1 was home, entered her room, and tried to remove her blanket while touching her breasts and vaginal area through it. When she resisted, he asked, " 'Do you not miss what we had?' " She said no, and he pulled down his pants and tried to masturbate on her. JD1 "threatened to call the police and scream or call [her] mom," so he left. JD1 went to her boyfriend's home and, at his urging, called 911. She reported the assault and how Peraza-Caamal had raped her "a couple years ago."

Bartl took JD1 to a police station, and she repeated her allegations. The next day, she made a recorded pretext call, which the jury heard. JD1 asked Peraza-Caamal to assure her he was "not gonna do it again," and he replied, "I already told you, you know, that, that, that's not gonna happen" because he was leaving Maria E.'s home. (Capitalization omitted.) Later in the call he reiterated he would be out of the home soon and had been trying to "fix" things with her so he could see his daughters. When JD1 said, "I love my sisters and I don't want you to touch them like you touched me," Peraza-

3

Caamal first said, "That will never happen and you know that," but when JD1 continued accusing him of touching her, he denied ever having done so. (Capitalization omitted.)

Detective Christopher Fuller took JD1 on a visit to Peraza-Caamal's workplace, of which the jury saw footage. When they opened a closet she had described as the place Peraza-Caamal most often raped her, Fuller testified, JD1 seemed to go into shock: she started to breathe heavily, panic, and cry.

After JD1's report, Detective Fuller also recorded an interview of JD2, which the jury saw. In that interview, JD2 described two times Peraza-Caamal touched her—once on the side of her vagina and once on her buttocks. She also described (as did JD1) a time when JD2, pretending to be asleep in the back seat of a car, saw Peraza-Caamal kiss JD1 on the lips.

The children were removed from Maria E.'s home. Some time later, JD2 "desperately wanted to go back," so she wrote a letter at Maria E.'s direction falsely stating that JD1 had told her to accuse Peraza-Caamal of abuse. In 2020, however, after Peraza-Caamal violated a restraining order by approaching her, she reported his past abuse in full (as described below) to the police.

At trial, JD2 testified that Peraza-Caamal repeatedly sexually abused her, at home or his worksite, from when she was 6 or 7 until she was 10 or 11. He digitally penetrated her "very often," had her orally copulate him once or twice, had vaginal sex with her more than thrice, and anal sex "[m]aybe once." JD2 identified a photo, found on his phone, of her orally copulating him. The photo had a date of January 1, 2017, though the police could not tell if it was taken then or was transferred to the phone from another device.

Dr. Blake Carmichael testified as an expert on CSAAS, which dispels "myths and misconceptions about child sexual assault and disclosure." At the

4

outset of his testimony, Dr. Carmichael disavowed knowing anything about Peraza-Caamal, JD1, JD2, or "any other facts about this case at all."[2] At the end of his direct examination, when asked, "Are you here today to provide an opinion about whether or not the victims in this case were sexually abused?" he answered, "No. I don't have an opinion either way. . . . I have no information about the case." He added, "I would have to be on a jury to decide if it happened or not. That's up to them. . . . I wouldn't form that opinion. . . ." On cross-examination, defense counsel expressed his understanding that CSAAS is "not a red flag saying, yes, this child has been abused" but serves to "explain why this child acted in a certain way, like changing their stories"—to say, "they acted this way. That doesn't mean they were lying." Dr. Carmichael replied, "Right. So that [using it as a red flag] would be using it inappropriately. . . . There's no checklist that decides if a kid was abused or not. People have tried to develop those and failed. . . . [¶] And so you don't look at the components and check them off and say, yes, abuse occurred. That would be an inappropriate use. . . . But you wouldn't use it to say abuse didn't occur, right? You just don't use it that way. It's just helping people understand the context [in] which these things can happen."

Subject to those disclaimers, Dr. Carmichael outlined five components of CSAAS: (1) secrecy, which refers to children often not disclosing abuse

---

[2] "Q. . . . Tell me what information you have about the defendant in this case, Mr. Peraza-Caamal. [¶] A. None. [¶] Q. . . . [D]o you have any information about the victim [JD1]? [¶] A. I do not. [¶] Q. Do you have any information about the victim [JD2]? [¶] A. No. I don't know their names, so. . . . [¶] Q. Did you even know that there were two victims in this case? [¶] A. No, not until I sat down today. [¶] Q. Do you have any other facts about this case at all? [¶] A. I do not. [¶] Q. Do you have any facts about the disclosures that either [JD1] or [JD2] made about the sexual abuse that the defendant perpetrated against them? [¶] A. I don't."

from a desire to avoid negative consequences and/or out of love or loyalty for a perpetrator; (2) helplessness, which refers to reluctance to report abuse even to trusted adults because of a perpetrator's authority—especially if a report has been rebuffed; (3) entrapment and accommodation, which include "giving in to the abuse, . . . cognitively saying he cares about me," or "thinking through [it] in a way that helps mitigate any abusive reflection upon what's happening"; (4) "delayed, unconvincing, and conflicted disclosure[s]"; and (5) recantation and retraction, in which "family pressure" or "negative outcomes of telling" can lead a child to recant.

The prosecutor then gave several detailed hypotheticals tracking the evidence in the case, such as: "Let's assume that a person by the name of Jane Doe Number 1, and . . . assume [the] following facts: That the defendant began grooming that person with back rubs in second grade, and the defendant began raping, sodomizing, orally copulating, and digitally penetrating the victim from approximately third grade to eighth grade, and the victim became pregnant in seventh grade, and the only sexual partner she had had until that time was the defendant, and the defendant attempted to terminate the pregnancy by feeding her lemon juice, pressing on her stomach, and finally giving her an injection of some unknown substance, which he referred to as something he used to do to cows all the time, and that the victim had a miscarriage, which ended that pregnancy, and that the victim did not disclose this to the authorities until after the defendant had committed the last act of sexual assault in 2017 when she was 14 years old. [¶] Can you explain why she might not tell people close to her?"

Dr. Carmichael explained how grooming—evolving from "appropriate signs of affection" to abusive touching—can keep a child from recognizing when "touch has become abusive or inappropriate," and how they might keep

6

the secret even after realizing the touching was wrongful out of reliance on the abuser or guilt for not having spoken sooner. Asked if, on the hypothesized facts, it is "inconsistent or consistent with somebody who has experienced sexual abuse to not tell people close to them," he replied, "I think the best way to say that is those things are not inconsistent with abuse happening. [In] studying kids who have been abused, these are the kinds of things we do see after they've been abused and the reasons for why they have not talked about it or are reluctant to do so. . . ." Asked if the child not having told her own sister was "not inconsistent with someone who has experienced child sexual abuse," he said, "It wouldn't surprise me that a child wouldn't tell other people close to them." After noting reasons why—like fear of being treated differently and the difficulty of admitting having done something seen as sinful—he concluded, "[I]t does not surprise me when kids don't tell peers or other people they feel close to. Certainly, some kids do, but it does not surprise me when kids have not done so, and that's . . . why I phrased it the way that I did."

Dr. Carmichael gave similar answers to questions about hypotheticals tracking, at a similar or lesser level of detail, JD1's or JD2's testimony about (1) Maria E.'s response to JD1's disclosure, Peraza-Caamal's claims to JD1 that people would not believe her, and his coercion during acts of abuse; (2) JD1 not making her 911 call until after years of abuse, and her incremental disclosure of its full extent; and (3) JD2's initial partial disclosure, retraction, and later full disclosure to the police, without having disclosed the abuse to Bartl.

The lone defense witness, Maria E., testified that the oral-copulation photo was of her and her boyfriend Jose Canul, not JD2. (She was not asked how such a photo came to be on her then-husband's phone.) She testified

7

that JD1 never told her of Peraza-Caamal having sex with her and never acted strangely, except for rebelliousness; that JD2 never told her that Peraza-Caamal sexually abused her; and that she never heard anyone tell Bartl about him having sex with JD1.

A jury found Peraza-Caamal guilty on two counts of continuous sexual abuse of a child (§ 288.5, subd. (a)) and found as aggravating factors that he committed each crime in a way involving great violence or bodily harm, against multiple vulnerable victims from a position of trust, and in a way indicating serious danger to society (§ 667.6, subds. (d), (e); 667.61, subds. (b), (e)); Cal. Rules of Court, rules 4.421(a)(1), (3), (11) & (b)(1)). The court sentenced him to 50 years to life in prison.

## DISCUSSION

### I.

### *Referring to Hypothetical Victims by the Same Pseudonyms Used for the Actual Victims Did Not Deny Due Process*

Peraza-Caamal claims the trial court violated state law, and denied him due process and the right to confront witnesses against him (U.S. Const., 5th, 6th, & 14th amends.), by letting the prosecutor ask Dr. Carmichael how CSAAS could help jurors understand the conduct of hypothetical abused children the prosecutor called "Jane Doe Number 1" and "Jane Doe Number 2"—i.e., the same pseudonyms used at trial for JD1 and JD2. Doing so, Peraza-Caamal contends, let Dr. Carmichael invade the province of the jury by vouching for JD1 and JD2 and effectively telling the jury that their claims of having been molested were true. We disagree.[3]

---

[3] The Attorney General contends Peraza-Caamal forfeited this claim by not objecting below. (*People v. Valdez* (2012) 55 Cal.4th 82, 130.) Peraza-Caamal counters that objection would have been futile because the following colloquy, which preceded the questions at issue, made clear that the court would allow use of the pseudonyms: "[Prosecutor]: . . . I'm going to give some

Peraza-Caamal theorizes that using the "Jane Doe" pseudonyms in the hypotheticals increased the risks of the jury drawing two improper inferences from Dr. Carmichael's testimony: (1) that his answers reflected a belief on his part that JD1 and JD2 were telling the truth, and/or (2) that by describing the behaviors and beliefs that CSAAS identifies as common among sexually abused children—and tries to explain—he had given jurors a

hypothetical facts for the witness to consider. [¶] [Court]: Okay. [¶] [Prosecutor]: . . . So we're just going to deal with Jane Doe Number 1 first. [¶] [Court]: You're actually giving a hypothetical, so it's not Jane Doe Number 1. [¶] [Prosecutor]: Well, she can be Jane Doe Number 1 in the hypothetical. [¶] [Court (to jury)]: I'll instruct you at the end of the case . . . regarding the lawyers' ability to use hypothetical questions . . . [with] expert witnesses. So that's what [the prosecutor] is doing. Go ahead."

We are unpersuaded. The court's phrasing did not suggest that it told counsel not to use "Jane Doe" for any reason but that the court thought that counsel had forgotten that he was discussing *hypothetical* questions. Once counsel said, "she can be Jane Doe Number 1 in the hypothetical," the court said nothing to suggest that it perceived the asserted problem with that approach now raised by Peraza-Caamal. Because an objection must " ' "fairly inform" ' " a court of the " ' "specific reason" ' " a party believes that evidence must be excluded (*People v. Valdez, supra*, 55 Cal.4th at p. 130), and this record does not suggest the trial court independently thought of the "specific reason" now identified by Peraza-Caamal, we do not agree that the court effectively raised and rejected the objection itself, making it futile for Peraza-Caamal to do so.

If his attorney did forfeit the objection, Peraza-Caamal next contends, then he provided ineffective assistance. But Peraza-Caamal has not shown that this is the rare case in which an appellate court can reach a claim of ineffective assistance on direct appeal even though defense counsel was not asked below to explain the conduct criticized on appeal. (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.) In any event, the claim of evidentiary error fails on its merits, as we conclude in text below, for lack of prejudice. That would dictate the same result for any ineffective assistance claim: any deficiency in counsel's performance did not cause prejudice. (*Mai*, at p. 1009 [relief for ineffective assistance requires both deficient performance and resultant prejudice].)

9

checklist with which they could reverse-engineer a conclusion that, because JD1 and JD2 exhibited many of the behaviors, they must have been abused. But the record reveals no such risk. Dr. Carmichael made very clear to the jury that (1) he had no personal knowledge of the case—including even, until that day, that there were two victims—from which he possibly could have formed a belief that JD1 and JD2 were telling the truth, and (2) it is improper to use the CSAAS as a checklist to determine if a child was abused, and experts who have tried to develop such checklists have failed.

Peraza-Caamal tries to liken this case to two early cases that involved, respectively, CSAAS (*People v. Jeff* (1988) 204 Cal.App.3d 309) and rape trauma syndrome (*People v. Coleman* (1989) 48 Cal.3d 112)—which analogously dispels myths about how survivors of rape react to that crime. But in *Coleman*, the trial court let an expert testify, after examining a victim's medical records, taped interview, and statements, that "her conduct and statements were consistent with 'rape trauma syndrome' " (*Coleman*, at pp. 143–144), while in *Jeff* the trial court allowed a prosecutor to state in opening argument that one expert would describe a child's symptoms and another would " '*tell you what these symptoms mean*,' " and then to state in closing argument that the second expert had " 'indicated to us that the symptoms . . . are consistent with the symptoms of a child that has been abused.' " (*Jeff*, at pp. 334, 336.) That did not occur here: Dr. Carmichael was careful to repeatedly describe aspects of the hypothetical Jane Does' behavior as "not inconsistent with" having been abused, and to emphasize that there is "no checklist that decides if a kid was abused or not"; that experts "have tried to develop those and failed"; and that, as a result, "you don't look at the components and check them off and say, yes, abuse occurred." Moreover, the court instructed the jury with CALCRIM No. 1193,

10

which did not exist at the time of *Jeff* and *Coleman*, and which, as discussed below, properly explains the limits of CSAAS evidence.

Accordingly, even if it would have been better practice to use different pseudonyms in the hypotheticals, we see no possibility that any arguable error in that regard caused prejudice under any standard—including the "harmless beyond a reasonable doubt" standard applicable if an error were of constitutional dimension. (*Chapman v. California* (1967) 386 U.S. 18, 23–24.)

## II.

### *CALCRIM No. 1193 Is Not Unconstitutional.*

Both before Dr. Carmichael testified and at the end of the case, the trial court instructed the jury with CALCRIM No. 1193: "You have heard testimony from Dr. . . . Carmichael regarding [CSAAS]. Dr. Carmichael's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Jane Doe Number 1 and Jane Doe Number 2's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of . . . her testimony."[4] Peraza-Caamal claims this was error because the instruction "allowed the jury to consider CSAAS evidence to determine whether JD1 and JD2's behavior matched that of child molestation victims when evaluating their credibility,

---

[4] Before he testified, the court stated, "You're going to hear testimony from . . . [¶] . . . [¶] . . . Dr. Carmichael regarding subjects centering upon what's called [CSAAS]. This testimony and the effects that he'll describe are not evidence that the defendant committed any crime charged against him. You may not consider this evidence for purposes of showing that the defendant is guilty of these charges. [¶] You may consider this evidence only in deciding whether or not Jane Doe Number 1 and Jane Doe Number 2's conduct was not inconsistent with the conduct of someone who has been molested or sexually abused and in evaluating the believability of the witness[es'] testimony."

11

effectively allowing them to consider that evidence to determine whether the charges were true." Reviewing the instruction de novo,[5] we disagree.

Courts of Appeal have uniformly held that CALCRIM No. 1193 properly informs a jury of the limitations on its use of CSAAS evidence. (*People v. Flores* (2024) 101 Cal.App.5th 438, 458–459; *People v. Ramirez* (2023) 98 Cal.App.5th 175, 219–220; *People v. Ortiz, supra*, 96 Cal.App.5th at pp. 815–816; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175–176; *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*).) Peraza-Caamal contends those courts were wrong, and CALCRIM No. 1193 is unconstitutional, for three reasons.

First, it assertedly allowed the jury to use CSAAS evidence "to diagnose or profile JD1 and JD2 as molestation victims because they behaved consistent[ly] with how Carmichael described one." To support this claim, Peraza-Caamal cites only an irrelevant decision about evidence that a *defendant* matched a profile of typical offenders. (*People v. Robbie* (2001) 92 Cal.App.4th 1075, 1086–1087.) The instruction here merely allowed jurors to use CSAAS evidence to conclude that a witness's conduct was "not inconsistent with" that of a child who was molested—i.e., to refute claims that, "if she'd really been molested, she would've done X," or "wouldn't have

---

[5] "We review a claim of instructional error de novo," viewing the challenged instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) Although Peraza-Caamal did not object to the instruction below, the parties agree we may consider his claim on appeal, as it raises a pure question of law about whether the instruction is correct. (See *People v. Ortiz* (2023) 96 Cal.App.5th 768, 815, fn. 23 ["We reach the merits of Ortiz's [challenge to CALCRIM No. 1193] despite his failure to object at trial because he contends the challenged instruction was legally incorrect"].)

done Y," or would have done Z differently. Peraza-Caamal asserts that the difference between "consistent with" and "not inconsistent with" is too subtle for jurors, but we presume they grasp and follow instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) Peraza-Caamal identifies no exception to that rule for cases in which an instruction's phrasing is assertedly "subtle."

Second, Peraza-Caamal argues, the instruction is "misleading" because, while it concededly "does not allow the jury to use CSAAS evidence as direct proof that JD1 and JD2 were molested," it lets the jury use the evidence "when considering their believability," which "effectively" allows the jury to use the evidence to "corroborate the credibility of their claims, i.e., as proof they were telling the truth and were molested." That argument borders on sophistry, and the *Gonzales* court rightly rejected it. Gonzales likewise deemed it "impossible to use the CSAAS testimony to evaluate the believability of [alleged victim]'s testimony without using it as proof that [he] committed the charged crimes," but the court explained that a reasonable juror "would understand CALCRIM No. 1193 to mean that the jury can use [the CSAAS] testimony to conclude that [the alleged victim's] behavior does not mean she lied when she said she was abused." (*Gonzales*, *supra*, 16 Cal.App.5th at pp. 503–504.) The jury "also would understand it cannot use [the CSAAS] testimony to conclude [the alleged victim] was, in fact, molested." (*Id.* at p. 504.) CSAAS evidence "simply neutralizes the victim's apparently self-impeaching behavior" so that "a juror who believes [the CSAAS] testimony will find both that [the alleged victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested." (*Ibid.*) We agree.

Third, Peraza-Caamal claims the instruction is "one-sided," assertedly "offering only the option to find JD1 and JD2's conduct consistent with that of molestation victims" and failing to "address the possibility" that delayed disclosure, a lack of outward signs of abuse, or recantation occurred "because their claims were false." He cites *People v. Moore* (1954) 43 Cal.2d 517, which held that giving "two instructions stated from the viewpoint of the prosecution" but failing to give "two requested by the defendant," when all were valid, could under the circumstances "have constituted a weighting of the scales in favor of the People." (*Id.* at p. 526.)

This case is not like that. The court gave a single, valid instruction not weighted in favor of either side. Although it does not expressly state that the reason for delayed disclosure, recantation, or a lack of perceptible signs of trauma may be that a child was not in fact molested, it need not do so. Those are the obvious, natural inferences jurors might tend to draw from those circumstances—a tendency that is the reason courts permit the use of CSAAS evidence to explain that children who have been abused often do not react as jurors might commonsensically expect. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 [CSAAS evidence " 'is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior' "].) CSAAS evidence "simply neutralizes" such behavior, ensuring that a juror who credits the evidence will find that the witness's "apparently self-impeaching behavior does not affect her believability one way or the other," thus balancing the scales. (*Gonzales, supra*, 16 Cal.App.5th at p. 504.)

In general, CALCRIM No. 1193 accurately describes the limited role of CSAAS evidence. (*Gonzales, supra*, 16 Cal.App.5th at pp. 503–504.) In this case in particular, there is little risk that the jury failed to understand that

14

limited role, given Dr. Carmichael's statements that he knew nothing of the case, and that no diagnostic tool can determine if a specific child has been molested.  The instruction reinforced that message by stating that CSAAS "is not evidence that the defendant committed any of the crimes charged" and may be considered "only in deciding whether or not [JD1 and JD2's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [their] testimony."  Nothing in this record rebuts our presumption that the jury understood and followed that instruction (*People v. Holt, supra*, 15 Cal.4th at p. 662).  Thus, assessing CALCRIM No. 1193 in the context of this record, we perceive no reasonable likelihood that the jury applied it impermissibly.

## DISPOSITION

The judgment is affirmed.

_____
Langhorne Wilson, J.


We concur:


_____
Humes, P.J.


_____
Banke, J.


A168718, People v. Peraza-Caamal

16